371 F.3d 49
 The Hartford Courant Company, Plaintiff-Appellant, American Lawyer Media, Inc. d/b/a the Connecticut Law Tribune, Intervenor-Plaintiff-Appellant,
v.
Joseph H. Pellegrino, Chief Court Administrator and William J. Sullivan, Chief Justice, Defendants-Appellees.
 No. 03-9141.
 United States Court of Appeals, Second Circuit.
 Argued: March 25, 2004.
 Decided: June 8, 2004.
 
 COPYRIGHT MATERIAL OMITTED RALPH G. ELLIOT, Hartford, CT, for Plaintiffs-Appellants The Hartford Courant Company and American Lawyer Media, Inc. d/b/a/ The Connecticut Law Tribune.
 MAUREEN DANEHY COX, Carmody & Torrance LLP, Waterbury, CT, for Defendants-Appellees Joseph H. Pellegrino and William J. Sullivan.
 DAVID A. SCHULZ, Levine Sullivan Koch & Schulz, L.L.P., New York, NY, for amici curiae The Associated Press, The Connecticut Society of Professional Journalists, The Day Publishing Company, the Hearst Corporation, the Record-Journal Publishing Company, NYP Holdings, Inc., The New York Times Company, and Reporters Committee for Freedom of the Press (Jay Ward Brown, Alia L. Smith, David McCraw, John K. Keitt, Jr., Jan F. Constantine, Lucy A. Daglish, of counsel).
 Before: MESKILL, KATZMANN, and WESLEY, Circuit Judges.
 KATZMANN, Circuit Judge:
 
 
 1
 This case calls upon us to decide whether the public and press have a qualified First Amendment right to inspect docket sheets and, if so, the appropriate remedy for its violation by state courts. The Hartford Courant and The Connecticut Law Tribune appeal from the dismissal of their demand for injunctive relief under 42 U.S.C. § 1983 by the United States District Court for the District of Connecticut (Gerard L. Goettel, District Judge). The plaintiffs argued below that the longstanding Connecticut state court practice of sealing certain docket sheets, as well as entire case files, violated their right of access to judicial proceedings and documents established under the First Amendment. While refraining from deciding the merits of the newspapers' claim, the district court instead dismissed the case on the ground that the court administrators sued did not have the authority to provide the relief requested, that of producing the docket sheets, because doing so would contravene prior court orders. On appeal, as they did below, the plaintiffs assert that such orders may not exist. We determine that the press and public possess a qualified First Amendment right of access to docket sheets. We also hold that, if the materials at issue were sealed administratively, the named defendants have the authority to grant access. As we are unable to discern, on the face of the minimal record before us, whether the materials were sealed in accordance with judicial orders or statutes, we vacate the judgment dismissing the action and remand the matter to the district court to ascertain, at the very least, an answer to this question. Finally, after reviewing the abstention doctrines that the defendants have raised, we hold that none applies in this case.
 
 I. BACKGROUND
 
 2
 Between 2002 and 2003, the newspaper plaintiffs learned that, over the prior 38 years, the Connecticut state court system had adjudicated what appeared to be thousands of cases where sealing procedures prohibited court personnel from allowing the public to access the files in those proceedings and, in certain comparatively rare instances, from acknowledging the existence of these cases altogether. Although some of these cases may have been sealed pursuant to a variety of statutory authorizations, including those directed at protecting juvenile offenders, see Hearing Before the Judiciary Comm. (Conn. Mar. 10, 2003) ("Judiciary Comm. Hearing") (statement of Rep. Farr), or those involving bar grievance procedures, see Judiciary Comm. Hearing (statement of Justice Peter Zarella), The Hartford Courant published an account that insinuated that many other cases may have been sealed simply at the behest of prominent individuals who were parties. See Eric Rich & Dave Altimari, Elite Enjoy "Secret File" Lawsuits, The Hartford Courant, Feb. 9, 2003, at A1 ("[J]udges have selectively sealed divorce, paternity and other cases involving fellow judges, celebrities and wealthy CEOs that, for most people, would play out in full view of the public....").
 
 
 3
 The revelation of this practice led to an investigation by the Connecticut General Assembly and considerable self-examination by the Connecticut judiciary. On March 10, 2003, the Judiciary Committee of the General Assembly held a hearing at which the Chief Justice of the Connecticut Supreme Court, William J. Sullivan, testified as to the origins of the practice. As he stated:
 
 
 4
 The best I can determine is that this started somehow and it might have gone back as early as the 70's where it became an unwritten rule that in those days there were 16 or 20 Superior Court Judges who were really very, very powerful, much more powerful than the judges are today probably because we had a try system of judges. And they felt, when they felt it was necessary, they would seal a file and just start it.
 
 
 5
 Judiciary Comm. Hearing (statement of Chief Justice William J. Sullivan). While this account suggests that judges themselves were responsible for the complete sealing of such cases, other passages in the transcript indicate instead that the files might have been administratively closed. In response to a representative's question about whether "somehow it's administrative and that the judges['] inten[t] or even perhaps express direction is somehow misinterpreted by the clerical administrative support[,] [s]o that individual documents may have been inten[ded] to be sealed, but in fact, whole files and docket numbers are then sealed," Judiciary Comm. Hearing (statement of Rep. Hamm), Chief Justice Sullivan acknowledged his uncertainty about whether or not that was the case, Judiciary Comm. Hearing (statement of Chief Justice William J. Sullivan). Although the Connecticut Senate introduced legislation that would have required that "the names of the parties and the docket number in any civil or criminal matter in the Superior Court ... not be kept confidential" in any future or pending cases, the legislature had not enacted this bill by the end of the 2003 Assembly session. See S. 362, 2003 Gen. Assem., Jan. Sess. (Conn. 2003).
 
 
 6
 Despite legislative inaction, the Connecticut judiciary itself promulgated new "Practice Book" rules — rules of court specifying procedures for closure more protective of the public's and the press's First Amendment rights of access and, in particular, mandating that the public be notified of potential closure of the courtroom or sealing of materials, that the judge articulate the overriding interest in closure or sealing and specify findings, and that any closure or sealing order be no broader than necessary. See Conn. Practice Book §§ 11-20(c)-(e), 11-20A (2004). The protections afforded by these new rules only became effective July 1, 2003, and were not applied retroactively.
 
 
 7
 This case concerns the system previously in place, which is best explained by a June 2000 memo from Civil Court Manager Judith D. Stanulis to the Trial Court Administrators and the Judicial District Chief Clerks (the "Stanulis Memo"). Although this Memo deals with filing, it appears to presume underlying court orders. It outlines three varieties of closure: under "level 1," which "should be used when a case is statutorily sealed or when the entire file is ordered sealed by the court," "the matter is confidential and no information is to be released or disclosed to the public, including the docket number and case caption," and should not be allowed to appear on any calendars; under "level 2," the entire file is sealed but the case caption and docket number may be disclosed; and under "level 3," specific documents are sealed. For both level 1 and 2 sealing, the "file is to be placed in an envelope and the outside is to be marked with the following information: Docket number; Case caption; Time and date of order to seal; Name of judge issuing order to seal; Whether there is a deadline after which disclosure may be made without a court order; and Name of person sealing the file." Once the Connecticut judiciary began to reevaluate its prior sealing practices, the judiciary appears to have re-classified all but one of the 104 pre-existing "level 1" cases, as "level 2" cases. As the counsel for Connecticut asserted at oral argument in the district court,
 
 
 8
 It's our position that those — and there are thousands of those cases, Your Honor. It's a — It is a fluid number, and if you read the various newspaper articles that are attached to the pleadings, you'll see that that number has changed. It's changed, in part, because case numbers are always fluid with cases coming into the system and being disposed of, but also because the judicial department has conducted a — an ongoing investigation of this entire issue, and as a result of that investigation what has been, in many instances, Level 1 sealed or case sealed — case level sealed, files have become Level 2 sealed files, and so on, so that number has fluctuated as a result of those two variables....
 
 
 9
 This description suggests a more flexible system of classification than would appear to be consistent with judicial orders. It is therefore not clear from record below whether court administrators interpreted the Stanulis Memo as requiring that sealing occur only to the extent that it was judicially commanded or read the document more broadly as authorizing administrative sealing.
 
 
 10
 In those cases where judges did issue sealing orders, these orders would have been authorized by several provisions in Connecticut law and the Practice Book. As of 1995, the most general of these provisions dealing with civil cases read:
 
 
 11
 Sec. 211B. Exclusion of the Public; Sealing Files Limiting Disclosure of Documents
 
 
 12
 (a) Except as provided in this rule and except as otherwise provided by law ... the court shall not order that the public, which may include the news media, be excluded from any portion of a proceeding and shall not order that any files, affidavits, documents, or other materials on file with the court or filed in connection with a court proceeding be sealed or their disclosure limited.
 
 
 13
 (b) Upon motion of any party, or upon its own motion, the court may order that the public be excluded from any portion of a proceeding and may order that files, affidavits, documents or other materials on file with the court or filed in connection with a court proceeding be sealed or their disclosure limited if the court concludes that such order is necessary to preserve an interest which is determined to override the public's interest in attending such proceeding or in viewing such materials. Any such order shall be no broader than necessary to protect such overriding interest.
 
 
 14
 (c) In connection with any order issued pursuant to paragraph (b) of this rule, the court shall, on the record in open court, articulate the overriding interest being protected and shall specify its findings underlying such order. The time and state of any such order shall be entered by the court clerk in the court file together with such order.
 
 
 15
 Conn. Practice Book § 211B (Cumm. Supp. 1995) (eff. Oct. 1, 1995) (emphasis added). The criminal counterpart to this section stated:
 
 
 16
 Sec. 895. Exclusion of the Public; Sealing or Limiting Disclosure of Documents
 
 
 17
 (a) Except as provided in this rule, and except as otherwise provided by law ... the judicial authority shall not order that the public, which may include the news media, be excluded from any portion of a court proceeding and shall not order that any files, affidavits, documents, or other materials on file with the court or filed in connection with a court proceeding be sealed or their disclosure limited.
 
 
 18
 (b) Upon motion of the prosecuting authority or of the defendant, or upon its own motion, the judicial authority may order that the public be excluded from any portion of a court proceeding and may order that files, affidavits, documents or other materials on file with the court or filed in connection with a court proceeding be sealed or their disclosure limited if the judicial authority concludes that such order is necessary to preserve an interest which is determined to override the public's interest in attending such proceeding or in viewing such materials. Any such order shall be no broader than necessary to protect such overriding interest.
 
 
 19
 (c) In connection with any order issued pursuant to paragraph (b) of this rule, the judicial authority shall, on the record in open court, articulate the overriding interest being protected and shall specify its findings underlying such order. The time and date of any such order shall be entered by the court clerk in the court file together with such order.
 
 
 20
 Conn. Practice Book § 895 (Cumm. Supp. 1995) (eff. Oct. 1, 1995) (emphasis added). Another Connecticut statute — a version of which has existed at least since 1974 — treated the sealing of records in juvenile matters, and required that "[a]ll records of cases of juvenile matters... be confidential and for the use of the court in juvenile matters, and open to inspection or disclosure to any third party, including bona fide researchers commissioned by a state agency, only upon order of the Superior Court...." Conn. Gen. Stat. Ann. § 46b-124(b) (West 2004) (emphasis added). As these sections reveal, there were two modes by which case files could be sealed, either statutorily, or by a written order of the district judge specifying the extent of closure.[1]
 
 
 21
 Plaintiff The Hartford Courant filed its complaint on February 21, 2003, alleging that the policies outlined in the Stanulis Memo violated its rights under, inter alia, the First and Fourteenth Amendments. The Courant asked for injunctive relief under 42 U.S.C. § 1983 and 1985 against defendants Joseph Pellegrino, the Chief Court Administrator, and Chief Justice William J. Sullivan, both in their administrative capacities, requesting, in addition to any other relief the court might deem appropriate:
 
 
 22
 A temporary and permanent order requiring Defendant to provide the Plaintiff with a copy, from each Level 1 and Level 2 case for which files exist and are henceforth created or can be reconstructed, (whether concluded or ongoing) of the docket sheet or such other document as will disclose (a) the names and status (e.g., Plaintiff or Defendant) of the parties; (b) the Judicial District and docket number of the case; (c) the nature of the case (e.g., marital dissolution, paternity, trade secret, contract); and (d) the nature and description of every document in the file of the case (e.g., complaint, answer, motion for alimony pendente lite).
 
 
 23
 The Connecticut Law Tribune subsequently filed an intervening complaint. The defendants moved to dismiss the complaints, claiming that the district court should abstain under any of a variety of doctrines and that the named defendants lacked the power to provide the plaintiffs with the relief sought.[2] Agreeing with the latter argument, the district court issued an order dismissing the case on November 3, 2003. See Hartford Courant Co. v. Pellegrino, 290 F. Supp.2d 265, 276-278 (D.Conn. 2003). This appeal followed.
 
 II. STANDARD OF REVIEW
 
 24
 We review de novo a district court's decision on a motion to dismiss. See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 194 (2d Cir.2003). "Dismissal is proper if, accepting all the allegations in the complaint as true and drawing all reasonable inferences in plaintiff's favor, the complaint fails to allege any set of facts that would entitle plaintiff to relief." Id.
 
 
 25
 We evaluate a district court's determination not to abstain under Younger or the Rooker-Feldman doctrine de novo, because it implicates the court's subject matter jurisdiction. Diamond "D" Const. Corp. v. McGowan, 282 F.3d 191, 197 (2d Cir.2002); Hachamovitch, M.D. v. DeBuono, 159 F.3d 687, 693 (2d Cir.1998). Decisions involving both Pullman and Burford abstention are, by contrast, reviewed for abuse of discretion, although the abuse of discretion inquiry is somewhat more searching in the abstention context. Hachamovitch, 159 F.3d at 693 ("Generally, we review a district court's decision to abstain on Burford grounds for abuse of discretion, but the scope of that discretion is narrowed by the federal court's obligation to exercise its jurisdiction in all but the most extraordinary cases[.]"); Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus, 60 F.3d 122, 126 (2d Cir.1995) ("We review the decision of the district court for an abuse of discretion, although our appellate inquiry is especially rigorous in this context.").
 
 III. ANALYSIS
 
 26
 A) The Contours of the First Amendment Right of Access
 
 
 27
 Although the district court considered the possibility of a First Amendment right of access to docket sheets, it did not appear to confirm or deny its existence.[3] Because the district court expressed uncertainty as to whether the public and the media enjoy such a right, we take this opportunity to resolve those doubts. In general, we refrain from analyzing issues not decided below, but we have the authority to decide issues that were argued before but not reached by the district court. See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124, 129, 129 n. 5 (2d Cir.2002) (reaching the question of whether the assertion of personal jurisdiction was reasonable when the district court had refrained from deciding the question in dismissing for lack of personal jurisdiction on the ground that, "[a]lthough the district court did not reach the reasonableness component of the analysis, the issue remains reviewable on appeal because it was `pressed or passed upon below'") (citation omitted); Booking v. Gen. Star Mgmt. Co., 254 F.3d 414, 418-19 (2d Cir.2001) (stating that "we have discretion to consider issues that were raised, briefed, and argued in the District Court, but that were not reached there"); Cent. Hudson Gas & Elec. Corp. v. United States EPA, 587 F.2d 549, 557-58 (2d Cir.1978) (noting reasons why this Court would pass upon an issue that the district court did not reach).
 
 
 28
 The prudential factors that we have considered in the past suggest that this is a particularly appropriate case in which to exercise our discretion to reach an issue that the district court discussed but did not decide. The existence of the First Amendment right — although not its application to this case — is a matter of law suitable for determination by an appellate tribunal in the first instance. See Booking, 254 F.3d at 419 (including as one of the two reasons for considering an issue not reached below that the question was purely legal); Cent. Hudson Gas & Elec. Corp., 587 F.2d at 557-58 (observing that "[t]he only issue involved in this case is one of law; there are no genuine issues of material fact"). Likewise, precisely because this case involves the First Amendment, and the appeal was expedited, we are eager to avoid the delay that remanding on the First Amendment question would occasion. See Cent. Hudson Gas & Elec. Corp., 587 F.2d at 558 (weighing the potential for delay to "affect not only the parties, but ... also have a significant adverse impact on the public interest" in favor of deciding a question in the first instance on appeal). Furthermore, other courts have similarly considered the viability of an asserted First Amendment claim on appeal from the dismissal of an action on procedural or jurisdictional grounds. See Flynt v. Rumsfeld, 355 F.3d 697 (D.C. Cir.2004) (addressing and denying the asserted First Amendment right for press representatives to travel with the military on appeal from the district court's dismissal of the complaint for lack of subject matter jurisdiction). Finally, in its brief to this Court, the State recognized the public's qualified right of access to court documents. We write only to clarify the narrow issue of whether docket sheets fall within the scope of this qualified right.
 
 
 29
 The right that the plaintiffs assert emanates from our precedents establishing the public's and the press's qualified First Amendment right to attend judicial proceedings and to access certain judicial documents. Taken together, these suggest that the media and the public possess a qualified First Amendment right to inspect docket sheets, which provide an index to the records of judicial proceedings.
 
 
 30
 In Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980), and its progeny, the Supreme Court recognized that the First Amendment grants both the public and the press a qualified right of access to criminal trials, see id. at 580, to the examination of jurors during voir dire, see Press-Enterprise Co. v. Superior Court, 464 U.S. 501 (1984) ("Press-Enterprise I"), and to preliminary hearings, see Press-Enterprise Co. v. Superior Court, 478 U.S. 1 (1986) ("Press-Enterprise II"). The circuits, including ours, have concurred in holding that this right applies to civil as well as criminal proceedings. See Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16, 23 (2d Cir.1984) (asserting that "the First Amendment does secure to the public and to the press a right of access to civil proceedings"); see also Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir.1988) (holding that the "rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case"); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1070 (3d Cir.1984) (determining that "the First Amendment embraces a right of access to [civil] trials") (citation and internal quotation marks omitted) .
 
 
 31
 Numerous federal and state courts have also extended the First Amendment protection provided by Richmond Newspapers to particular types of judicial documents, determining that the First Amendment itself, as well as the common law, secures the public's capacity to inspect such records. See, e.g., In re Providence Journal Co., 293 F.3d 1, 10-13 (1st Cir.2002) (holding that the District of Rhode Island's blanket policy of refusing to file memoranda of law that counsel were required to submit in connection with motions violated the First Amendment); Phoenix Newspapers, Inc. v. United States Dist. Court, 156 F.3d 940, 948 (9th Cir.1998) (determining that the First Amendment requires "release of transcripts [of closed criminal proceedings] when the competing interests precipitating hearing closure are no longer viable"); United States v. Antar, 38 F.3d 1348, 1359-60 (3d Cir.1994) (stating that "the right of access to voir dire examinations encompasses equally the live proceedings and the transcripts which document those proceedings" and observing that "[i]t is access to the content of the proceeding — whether in person, or via some form of documentation — that matters"); Grove Fresh Distrib., Inc. v. Everfresh Juice Co., 24 F.3d 893, 897 (7th Cir.1994) (asserting that "[t]he First Amendment presumes that there is a right of access to proceedings and documents which have `historically been open to the public' and where the disclosure of which would serve a significant role in the functioning of the process in question") (emphasis added); Globe Newspaper Co. v. Pokaski, 868 F.2d 497, 505 (1st Cir.1989) (concluding that, "after Richmond Newspapers, a blanket prohibition on the disclosure of records of closed criminal cases of the types at issue here implicates the First Amendment"); In re Search Warrant, 855 F.2d 569, 573 (8th Cir.1988) (stating that, although "[t]he Supreme Court has not addressed the question whether the First Amendment right of public access extends to documents," "[w]e are persuaded that the First Amendment right of public access does extend to the documents filed in support of search warrant applications").
 
 
 32
 The circuits that have considered the question have employed two types of reasoning in arriving at decisions that the public and press should receive First Amendment protection in their attempts to access certain judicial documents. Courts adopting the first approach have applied the test for establishing presumptive openness that the Supreme Court distilled from its precedents in Press Enterprise II, where it formulated a two-pronged inquiry for evaluating whether particular proceedings should enjoy openness. As the Court explained:
 
 
 33
 In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a tradition of accessibility implies the favorable judgment of experience, we have considered whether the place and process have historically been open to the press and general public.... Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question.
 
 
 34
 Press-Enterprise II, 478 U.S. at 8 (citations and internal quotation marks omitted). This analysis has been summarized as requiring examination of both "logic" and "experience" in establishing the public's and press's qualified First Amendment right of access. See ABC, Inc. v. Stewart, 360 F.3d 90, 98 (2d Cir.2004) (internal quotation marks omitted). The courts that have undertaken this type of inquiry have generally invoked the common law right of access to judicial documents in support of finding a history of openness. See, e.g., In re Search Warrant, 855 F.2d at 573. The Supreme Court elaborated upon this ability to inspect and copy judicial documents at common law in Nixon v. Warner Communications, Inc., 435 U.S. 589 (1978), where it explained that "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents," id. at 597, and that "[t]he interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies," id. at 597-98. Although Nixon did not constitutionalize the right, that case was decided before the Court had established the existence of a qualified First Amendment right to attend criminal trials and other proceedings, and involved, as the Court specified, a claim for physical access to tape recordings when "[t]he contents of the tapes were given wide publicity by all elements of the media" and there was "no question of a truncated flow of information to the public." Id. at 609. Nixon has, therefore, not impeded the circuits in their efforts to derive historical support for the public availability of certain judicial documents in the American common law heritage.
 
 
 35
 Courts adhering to the second approach have viewed the media's and public's qualified right of access to judicial documents as derived from or a necessary corollary of the capacity to attend the relevant proceedings. In explaining the importance of the ability to ascertain the substance of particular proceedings, the Third Circuit stated that "[i]t would be an odd result indeed were we to declare that our courtrooms must be open, but that transcripts of the proceedings occurring there may be closed, for what exists of the right of access if it extends only to those who can squeeze through the door?" Antar, 38 F.3d at 1360. This Court has followed a similar logic, deeming that the right to inspect documents derives from the public nature of particular tribunals. Our decision in In re The New York Times Company, considering the right of access to documents filed in connection with pretrial motions, observed that "[o]ther circuits that have addressed [the] question have construed the constitutional right of access to apply to written documents submitted in connection with judicial proceedings that themselves implicate the right of access. We agree that a qualified First Amendment right of access extends to such documents." 828 F.2d 110, 114 (2d Cir.1987); see also United States v. Gerena, 869 F.2d 82, 85 (2d Cir.1989).
 
 
 36
 Both analyses establish the existence of a qualified First Amendment right of access to docket sheets. As the plaintiffs and amici emphasized both in their briefs and at oral argument, the ability of the public and press to attend civil and criminal cases would be merely theoretical if the information provided by docket sheets were inaccessible. In this respect, docket sheets provide a kind of index to judicial proceedings and documents, and endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment. As we observed in United States v. Haller, the docketing of a hearing on sealing provides effective notice to the public that it may occur. 837 F.2d 84, 87 (2d Cir.1988). See also In re Application of the Times Union, Gannett Co., No. 89-513M, 1990 WL 6605 at *3, 1989 U.S. Dist. LEXIS 16159, at *7 (W.D.N.Y. Jan. 26, 1989) (emphasizing the importance of the docket sheet in alerting the public to the entry of a sealing order); Commonwealth v. Doe, 648 N.E.2d 1255, 1260 (Mass. 1995) ("If the preliminary hearing [held to determine whether a defendant made out a prima facie case in favor of sealing] was held some time after the underlying case has been disposed of, notice may be provided by means of an entry on the public docket sheets, as is normal procedure."). Sealed docket sheets would also frustrate the ability of the press and the public to inspect those documents, such as transcripts, that we have held presumptively open. See, e.g., Haller, 837 F.2d at 87. Finally, the inaccessibility of docket sheets may thwart appellate or collateral review of the underlying sealing decisions. Without open docket sheets, a reviewing court cannot ascertain whether judicial sealing orders exist.
 
 
 37
 The two-pronged inquiry that Press Enterprise II outlined also supports a qualified First Amendment right of access. Experience casts an affirming eye on the openness of docket sheets and their historical counterparts. According to the Oxford English Dictionary, "docket" in the relevant sense designates a "memorandum or register of legal judgments." 4 Oxford English Dictionary 912 (2d ed. 1989). Early English usage confirmed the openness of the docket books, which were maintained by the clerks, and, although different in form from the docket sheets at issue here, covered similar matters. Tomlins's Law Dictionary of 1809, defining "docket" or "dogget," explained that, "[w]hen rolls of judgments are brought into C.B. [Common Bench] they are docketted, and entered on the docket of that term; so that upon any occasion you may soon find out a judgment, by searching these dockets, if you know the attorney's name." Sir Thomas E. Tomlins, The Law Dictionary (2d ed.) (1809).
 
 
 38
 Our national heritage is not inconsistent. Since the first years of the Republic, state statutes have mandated that clerks maintain records of judicial proceedings in the form of docket books, which were presumed open either by common law or in accordance with particular legislation.[4] As one court explained in elaborating upon the Massachusetts experience: The legislative mandate that the clerks maintain alphabetical indices [of the names of all parties to every recorded action or judgment] has continued uninterrupted for the past two centuries.... To be sure, there were — and continue to be — practical limitations on the availability and actual preparation of alphabetical indices by the various clerks offices throughout the Commonwealth. But it is apparent that when the offices were open such indices as the clerks had prepared were made accessible to the public. By modern times the record keeping practices of the clerks offices had, with predictable idiosyncratic exceptions, crystallized into a general pattern for closed criminal cases. Closed criminal case files were referenced in docket sheets; the docket numbers for these cases were assigned in various inconsistent and changing ways over the years but were largely in chronological order; the docket sheets for the cases were gathered together in chronological order in docket books.... All of the relevant documents ... were open to the public.
 
 
 39
 Globe Newspaper Co. v. Fenton, 819 F. Supp. 89, 92-93 (D. Mass. 1993). This basic pattern was characteristic of many other jurisdictions. See, e.g., Werfel, 260 N.Y.2d at 798 (holding, in the context of a case involving the availability for public inspection of criminal docket books, "that files in the possession of the clerk of the Criminal Court of the City of New York are public records which may be fully examined by any person, unless the papers have been sealed from public scrutiny by the court or by the terms of a statute"); Carley v. Lee, 119 P.2d 236, 238 (Ariz. 1941) ("Such persons may make themselves perfectly safe in that particular, by searching the docket book of judgments in the proper office....") (citation omitted); Tobin v. Knaggs, 107 S.W.2d 677, 679 (Tex.Civ.App. 1937) (citing a statute that specified that "[t]he clerk shall keep such other dockets, books and indexes as may be required by law; and all books, records and filed papers belonging to the office of county clerks shall at all reasonable times be open to the inspection and examination of any citizen, who shall have the right to make copies of the same") (internal citations omitted); Morrow v. Pucher, 244 N.Y.S. 174, 175 (N.Y.Sup.Ct. 1930) ("It seems to be well settled that the docket of a justice of the peace is a public record and open to examination by the public."); A.H. Belo & Co. v. Lacy, 111 S.W. 215, 217-18 (Tex. Civ. App. 1908) ("We think that under the statute the clerk's file docket is an official record book of a court of justice required by law to be kept.... Being a public record of a court of record by law, it is subject to inspection by the public, though the full contents of the files from which the data of the record are made may not be legally published at the time the record is made."); Woods v. Mains, 1 Greene 275, 1848 WL 215 at *4 (Iowa 1848) (stating, in a case involving judgment liens, that "[t]he statute required ... judgments to be entered in alphabetical order in the judgment docket, a public record book, in the clerk's office; and imposed a heavy fine on the clerk if he did not so enter it"). History therefore demonstrates that docket sheets and their equivalents were, in general, expected to remain open for public viewing and copying.
 
 
 40
 Logic supports this judgment of history. In the case of docket sheets, "[o]penness ... enhances both ... basic fairness ... and the appearance of fairness so essential to public confidence in the system." Press-Enterprise I, 464 U.S. 501, 508. Precisely because docket sheets provide a map of the proceedings in the underlying cases, their availability greatly enhances the appearance of fairness. They have also been used to reveal potential judicial biases or conflicts of interest. See, e.g., David Barboza, Bias Issue Arises for Monsanto Case Judge, N.Y. Times, Jan. 9, 2004, at C1. In addition, docket sheets furnish an "opportunity both for understanding the system in general and its workings in a particular case." Richmond Newspapers, Inc., 448 U.S. at 572. By inspecting materials like docket sheets, the public can discern the prevalence of certain types of cases, the nature of the parties to particular kinds of actions, information about the settlement rates in different areas of law, and the types of materials that are likely to be sealed. See Files of the Massachusetts Superior Court, supra, at 36-38 (detailing the information that can be gleaned from early Massachusetts docket books). Thus docket sheets do not constitute the kinds of government records that function properly only if kept secret, like grand jury proceedings. See Press-Enterprise II, 478 U.S. at 8-9.
 
 
 41
 The decisions of other circuits confirm this analysis. In United States v. Valenti, 987 F.2d 708 (11th Cir.1993), the Eleventh Circuit considered a case involving a joint prosecution of a Florida defense attorney and an assistant state attorney on charges of conspiracy, extortion, and bribery that had initially been subject to secret docketing. The court determined that the "maintenance of a public and a sealed docket is inconsistent with affording the various interests of the public and the press meaningful access to criminal proceedings" and that the "dual-docketing system can effectively preclude the public and the press from seeking to exercise their constitutional right of access to the transcripts of closed bench conferences." Id. at 715. The dual docketing system thus violated the public's First Amendment right of access by rendering it impossible for anyone to exercise that right. Likewise the Fourth Circuit reversed the sealing of docket sheets in certain criminal matters, holding that an order requiring such sealing was overbroad and violated the plaintiffs' First Amendment rights. See In re State-Record Company, Inc., 917 F.2d 124 (4th Cir.1990) (per curiam). As the court observed in discussing the overbreadth of the orders sealing the records,
 
 
 42
 There are probably many motions and responses thereto that contain no information prejudicial to a defendant, and we can not understand how the docket entry sheet could be prejudicial. However, under the terms of the orders entered in these cases, this information, harmless as it may be, has also been withheld from the public.
 
 
 43
 Id. at 129. The Eighth Circuit, considering the content of docket sheets more specifically, observed, like the court in Valenti, that:
 
 
 44
 The docketing of motions to close a proceeding or seal certain documents provides notice to the public, as well as to the press, that such a motion has been made and, assuming that such motions are docketed sufficiently in advance of a hearing on or the disposition of the motion, affords the public and the press an opportunity to present objections to the motion.
 
 
 45
 In re Search Warrant, 855 F.2d at 575. The only decision denying a First Amendment right to public docketing concerned grand jury proceedings, which the Supreme Court has emphasized are entitled to a presumption of secrecy. See In re Sealed Case, 199 F.3d 522 (D.C. Cir.2000).
 
 
 46
 We therefore hold that docket sheets enjoy a presumption of openness and that the public and the media possess a qualified First Amendment right to inspect them. Of course, this "presumption is rebuttable upon demonstration that suppression `is essential to preserve higher values and is narrowly tailored to serve that interest.'" Grove Fresh Distrib., Inc., 24 F.3d at 897 (quoting Press Enterprise I, 464 U.S. at 510).
 
 B) The Appropriateness of the Defendants
 
 47
 The district court articulated as its ground for dismissing this case that neither defendant had "the authority [] or the power to provide the plaintiffs with the relief they seek." Hartford Courant Co., 290 F. Supp.2d at 278. The court reached this conclusion after considering the Connecticut statutes governing the review of court orders and those delineating the scope of the duties and powers of the court administrators. See id. at 276-78. The district court's holding was based upon the assumption that orders exist prohibiting the plaintiffs from accessing the requested docket sheets. See id. at 276 ("If the defendants were to disclose the requested data, they would in effect be altering or reconsidering existing sealing orders previously entered by other judges."); id. at 277 ("Neither statute [outlining the authority of the administrators] provides for either defendant to vacate sealing orders."). On appeal, however, the plaintiffs insist, albeit without any direct evidence to support their allegations, that there is no reason to believe that judicial orders exist forbidding the disclosure; instead, the plaintiffs argue that we should draw a contrary inference given that court administrators evidenced an ability to internally reclassify 103 of the 104 "level 1" cases. If the plaintiffs are correct, then the district court arrived at an improper conclusion regarding the authority of the defendants. The distinction that the plaintiffs draw between docket sheets sealed pursuant to judicial orders or statutes and those sealed in accordance with administrative fiat is a critical one. Here, the defendant administrators can provide relief as long as they do not encounter the resistance of actual judicial orders or statutory sealing provisions.
 
 
 48
 The defendants contend that The Hartford Courant and The Connecticut Law Tribune failed to raise the possibility that the docket sheets were not, in fact, sealed by statute or judicial order in their complaints, and, therefore, that they waived this argument and the motion to dismiss was properly granted. The complaints do indeed read at certain moments as though they were alleging that judicial orders mandated the sealing of docket sheets as well as other records. As plaintiffs and amici explained at oral argument, however, The Hartford Courant's complaint was drafted largely with reference to articles discussing the sealed cases that had appeared in the paper. Because these pieces were composed without the benefits of discovery, the newspaper was unable to discern whether or not orders existed; the resulting complaint was therefore imprecise. However, the complaint also requested "[s]uch other relief as under the circumstances may be just and appropriate." This other relief could consist in access to those docket sheets not judicially or statutorily sealed.
 
 
 49
 The duties and powers of the Chief Court Administrator and the Chief Justice are established by statute. Among other things, the Chief Court Administrator "may establish reasonable fees for conducting searches of court records," Conn. Gen. Stat. Ann. § 51-5a(b) (West 2004), and the Chief Justice "shall be the head of the judicial department and shall be responsible for its administration," Conn. Gen. Stat. Ann. § 51-1b(a) (West 1985). The reference to searches of court records within the statute enumerating the duties of the Chief Court Administrator demonstrates that such examinations are within his purview. It is true, however, that neither the Chief Court Administrator nor the Chief Justice are vested, in their administrative capacity, with the authority to overturn orders issued by other judges or to open statutorily sealed files. They are, therefore, not able to provide relief to the plaintiffs insofar as that relief would require them to grant access to documents that are sealed by statute or judicial order.
 
 
 50
 Nevertheless, in the face of the threadbare record before us, we are unable to discern whether any documents actually were sealed pursuant to judicial orders or statutes such that the defendants' administrative authority would preclude them from allowing the plaintiffs to access those documents in contravention of judicial or statutory directives. On the one hand, the plaintiffs have not come forward with any evidence suggesting that the documents were sealed in the absence of such authorities. On the other hand, the district court apparently dismissed the action before the plaintiffs had conducted discovery and the defendants have never confirmed whether documents were sealed pursuant to statute or judicial order. Instead, the defendants rely on the language in the Stanulis Memo, which appears to presume the existence of underlying court orders, to argue that any documents that were sealed must have been sealed on the basis of such orders. However, during the course of oral argument in the proceedings below, the defendants' counsel described the sealing procedures in a fashion that suggested a more flexible system of classification than is consistent with judicial orders. In light of this description, the Stanulis Memo alone does not entirely clarify whether court administrators sealed documents pursuant to statutes or judicial orders or whether they instead construed the Stanulis Memo broadly to authorize administrative sealing. Discovery would illuminate this issue. We therefore vacate the district court's dismissal of the action and remand the case.
 
 
 51
 Among the questions to be resolved on remand is whether any orders explicitly seal docket sheets. There may also be cases in which the sealing order in place at the time has expired, a fact that should be evident from the face of a file, according to the Stanulis Memo.
 
 
 52
 If, on remand, the district court determines that particular docket sheets have indeed been sealed pursuant to statutes or judicial orders and that the defendants therefore are without the authority to provide the plaintiffs with access to them, the district court may, of course, consider any request by the plaintiffs for alternative forms of relief. At the very least, the court may want to consider any request on the part of the plaintiffs to amend the complaints with respect to the parties from whom relief is sought.
 
 
 53
 To the extent that the district court determines that the defendants do have the authority to grant access to particular docket sheets, the litigants in the underlying cases may have valid privacy interests. When asked at oral argument whether the names of juveniles or other protected parties would be included on docket sheets, the defendants responded that pseudonyms are generally used. If this is found not to be the case in certain instances, or if the State alleges an "extraordinary situation[];" such as we discussed in Haller, where "an individual might be [put] at risk" from public docketing, Haller, 837 F.2d at 87 (internal quotation marks omitted), the district court may take steps to protect the privacy interests involved. For example, the court could allow the State time to notify the parties involved in the underlying litigation or entertain motions from the State itself to maintain those specific docket sheets under seal. See Pokaski, 868 F.2d at 511 ("Many defendants may have foregone an opportunity to argue for sealing at the close of their cases, relying instead on the automatic [statutory] sealing provision.... We think it only fair, therefore, that the Commonwealth be given some time to notify defendants affected by our holding in any way it deems practicable. Accordingly, the Commonwealth has 60 days from the date this decision becomes final to comply with the Globe's request."). These examples are not an exhaustive list of the methods that the district court might consider employing to protect any implicated privacy interests.
 
 
 54
 C) The Inapplicability of Various Abstention Doctrines
 
 
 55
 The district court, in its opinion, determined that none of the grounds for abstention that the defendants raised below militated against accepting jurisdiction in this case. Hartford Courant Co., 290 F. Supp.2d at 270-75. On appeal, however, the defendants again argue that abstention is advisable. Review of various abstention doctrines does not, however, lead us to believe that any are particularly applicable in this case.
 
 
 56
 Before considering the merits of each argument in favor of abstention separately, it is helpful to review a case that the defendants argue is sufficiently similar to the instant case to warrant abstention on various grounds, a case that is currently progressing through the state court system in Connecticut and awaits decision by the Connecticut Supreme Court. In Rosado v. Bridgeport Roman Catholic Diocesan Corp., 825 A.2d 153 (Conn. App. Ct. 2003), cert. granted 832 A.2d 71 (Conn. 2003), The New York Times applied to the Connecticut Superior Court to "create a new file to address its pending motion seeking to vacate sealing and protective orders entered in twenty-three lawsuits alleging sexual abuse of minors by clergymen." Id. at 156. Although the lawsuits had been withdrawn — and settled — a year before, the Superior Court judge agreed to open such a new file. Reviewing this decision, the Connecticut Appellate Court held that, "in granting the Times's application to create a new file, the court exercised direct authority over the underlying cases, which had the same effect as restoring those cases to the docket." Id. at 170. It further determined that "the court was precluded from taking the actions that it did by the four month [statutory] jurisdictional limitation" governing the time to open a judgment or to restore a case to the docket and that "the court had no inherent authority over the files in its custody." Id. at 172. Finally, it rejected the Times's argument that "interpretation of [the statute governing the time to open a judgment or to restore a case to the docket] as an absolute bar to requests for modification of sealing or protective orders in cases withdrawn more than four months earlier renders the statute unconstitutional under the first amendment." Id. at 179. According to the reasoning of the appellate court, "claims involving constitutional rights, like all other claims, must be asserted in a timely manner." Id. On appeal to the Connecticut Supreme Court, the question presented is limited to whether "the Appellate Court properly conclude[d] that the trial court improperly granted the application to create a new file." Rosado, 832 A.2d at 71.
 
 
 57
 Rosado is quite different in several respects, however, from the present case. First, the appellate court in Rosado did not consider whether or not the protective orders covered all the materials in the court files, because "that issue was not specifically raised on appeal." Rosado, 825 A.2d at 173 n. 33. Because the crux of this case is whether or not protective and sealing orders exist over the docket sheets to which the newspapers seek access, resolution of the issues involved in Rosado will not illuminate what should happen when, as here, closures may not have resulted directly from judicial orders. Second, as the district court observed below, plaintiffs in this case request a very different remedy than those in Rosado — docket sheets in approximately 10,000 cases rather than the unsealing and release of files from certain specified cases. The most important distinction may be that the plaintiffs in Rosado sought access primarily to pretrial discovery materials, to which, as the Connecticut Appellate Court observed, the Supreme Court concluded that there is no First Amendment right of access, Rosado, 825 A.2d at 179, whereas here the newspapers are attempting to view docket sheets, which, as we have held supra, are presumptively open to public inspection.
 
 
 58
 i) Pullman Abstention
 
 
 59
 The defendants first argue that the district court erred in failing to determine that Pullman abstention applied. This form of abstention originated with the Supreme Court's decision in R.R. Comm'n v. Pullman Co., which involved a challenge to an order of the Texas Railroad Commission as unauthorized by Texas law and a violation of the Fourteenth Amendment and Commerce Clause. 312 U.S. 496, 498 (1941). Justice Frankfurter, writing for the Supreme Court, determined that abstention would be appropriate because it would avoid the need to address difficult constitutional questions dependent on the interpretation of state law in a situation where a decision on the ambiguous state law could not "escape being a forecast rather than a determination" and might be "supplanted by a controlling decision of a state court." Id. at 499-500. The fact that the Court was acting in equity only reinforced the advisability of abstention, because "[f]ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies." Id. at 500. The Court did not, however, simply dismiss the case, but instead remanded to the district court with instructions "to retain the bill pending a determination of proceedings, to be brought with reasonable promptness, in the state court." Id. at 501-02.
 
 
 60
 We have abstained under Pullman "when three conditions are met: (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible `to an interpretation by a state court that would avoid or modify the federal constitutional issue.'" Vt. Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 385 (2d Cir.2000) (citation omitted). Even when these conditions are fulfilled, we are not required to abstain, and, to the contrary, "important federal rights can outweigh the interests underlying the Pullman doctrine." Id. (internal quotation marks omitted).
 
 
 61
 The most important difference between this case and one in which Pullman abstention would be appropriate is that, to the extent that the court administrators' acts of sealing cases pursuant to the Stanulis Memo exceeded the authorization of court orders, there is no applicable state statute. Furthermore, the weight of the First Amendment issues involved counsels against abstaining.
 
 
 62
 ii) Younger Abstention
 
 
 63
 The doctrine established by Younger v. Harris, 401 U.S. 37 (1971), and its successors forbids federal courts from enjoining ongoing state proceedings. See 17A Charles Alan Wright et al., Federal Practice & Procedure §§ 4251-4255 (2d ed. 1988). Although the holding in Younger itself was limited to state criminal trials, it has subsequently been extended to cover certain civil proceedings. See Wright, supra, § 4254. As applied in our Circuit, "Younger abstention is mandatory when: (1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." Spargo v. N.Y.S.tate Comm'n on Judicial Conduct, 351 F.3d 65, 75 (2d Cir.2003). In this case, the defendants claim that the Rosado case constitutes precisely such a pending state proceeding. The district court, however, refused to apply Younger on the ground that there was not a strict identity of plaintiffs in the state and federal court actions; whereas the plaintiffs in state court are The New York Times and The Hartford Courant, in federal court they are The Courant and The Connecticut Law Tribune. Hartford Courant Co., 290 F. Supp.2d at 272-73. The question of the extent to which the plaintiffs in a federal action must be identical to the plaintiffs or defendants in the state court case upon which abstention is based is more complicated and less settled, however, than the district court acknowledged. Compare Spargo, 351 F.3d at 85 (holding that, because the federal plaintiffs' claims were essentially derivative of the state defendant's, Younger abstention applied), with Steffel v. Thompson, 415 U.S. 452 (1974) (allowing the suit of an individual who had himself narrowly avoided prosecution for criminal trespass by distributing handbills at a shopping center when his companion was, in fact, prosecuted, to proceed).
 
 
 64
 There is instead another and more compelling reason not to abstain — that the constitutional claims in the state and federal actions are, in actuality, quite different and, therefore, the state proceeding does not "afford the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." Spargo, 351 F.3d at 75. It is not the constitutionality of a particular statute — as in the Rosado case — but rather of the procedures set forth in the Stanulis Memo or the unauthorized actions of the court administrators that form the gravamen of the federal plaintiffs' complaint. The state case therefore does not provide a meaningful opportunity for review of the federal plaintiffs' constitutional claims.
 
 
 65
 iii) Rooker-Feldman Doctrine
 
 
 66
 On appeal, the defendants assert that the district court refused to apply the Rooker-Feldman doctrine for the same reasons as it denied Younger abstention. Examination of the district court's opinion demonstrates that this is manifestly incorrect. See Hartford Courant Co., 290 F. Supp. at 274-75. Piecing together the plaintiff's argument for abstention below from the district court's account, it appears that the defendants claimed, on the basis of Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983), which prohibit a federal court from acting as a state appellate tribunal, that, by permitting the action to proceed, the court would be reviewing the thousands of orders closing the underlying state cases. Hartford Courant Co., 290 F. Supp. at 274-75. There are two responses. First, Rooker-Feldman is not generally applied to bar a suit by those who were not parties to the original state court action. See 18B Wright, supra, § 4469.1, at 133-37 (2d ed. 2002); Johnson v. DeGrandy, 512 U.S. 997, 1004-06 (1994) (permitting a suit by a nonparty in the earlier action to proceed). The newspapers involved here were not parties to — nor did they intervene in — the state litigations. Secondly, where plaintiffs do not challenge specific closure orders but rather the sealing process as administratively implemented, Rooker-Feldman does not apply.
 
 
 67
 iv) Burford Abstention
 
 
 68
 In Burford v. Sun Oil Co., 319 U.S. 315 (1943), the Supreme Court determined that the federal courts should not, "as a matter of sound equitable discretion," id. at 318, have exercised jurisdiction in a case challenging an order permitting Burford to drill oil wells on a plot of land The order in question emanated from a complex state regulatory scheme that the federal courts would disrupt if they interfered on a piecemeal basis. Id. In this case, the district court held that Burford did not apply because the Connecticut Superior Court rules and statutes did "not comprise a complex state regulatory scheme." Because the district court did not clearly abuse its discretion in arriving at this determination, we affirm.
 
 CONCLUSION
 
 69
 We hold that the public and press enjoy a qualified First Amendment right of access to docket sheets. We also hold that the defendant court administrators have the authority to grant access to those docket sheets if the documents were sealed solely in accordance with administrative orders. Because we are unable to determine, on the basis of the current record, whether the docket sheets were sealed pursuant to judiciary or statutory authorization, we vacate the judgment of dismissal and remand to the district court for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 It appears that, before 1995, no practice book provision authorized sealing in civil cases. The closure of criminal cases was, for some period, governed by a rather broadly phrased statement that mentioned nothing of sealed documents and read:
 Upon motion of the prosecuting authority or of the defendant, or upon his own motion, the judicial authority may, when constitutionally permissible, order that the public, which may include the news media, be excluded from any portion of a proceeding when there is a substantial likelihood that the presence of the public, including the news media, would unduly inhibit any testimony, or endanger the safety of any witness, or interfere with the defendant's right to a fair trial or when exclusion is required by statute.
 Conn. Practice Book § 895, explanatory footnote (Cumm. Supp. Oct. 1995).
 
 
 [2]
 In their Reply Brief, the defendants also denied the existence of any constitutional right of access to docket sheets
 
 
 [3]
 The relevant passage of the district court's opinion reads:
 While there is ample case law regarding the public's and the media's rights to judicial documents in civil matters, there is little reported on the right of access to the court's docketing reports. There is one reported case addressing this issue, where the Eleventh Circuit held that the maintenance of a dual docketing system by the Middle District of Florida was an unconstitutional infringement on the public and press's qualified right of access to criminal proceedings. United States v. Valenti, 987 F.2d 708 (11th Cir.1993).... The Valenti opinion does not address nor offer any guidance to the trial court on the retrospective effect, if any, of its holding. Nor did this court locate any other cases examining the public's right of access to civil case detail where a dual docketing system was maintained.
 Hartford Courant Co., 290 F. Supp.2d at 275-76.
 
 
 [4]
 Although the exact composition of docket books may have differed between jurisdictions, they were generally maintained by clerks, and provided an outline of important stages in and the outcomes of each litigation. According to a description of the early Massachusetts docket books,
 [They were] kept by clerks to record basic information about cases and to chart their major events. These books usually include the names of the principals, the names of the lawyers, the offense charged, and in some counties the type of civil case.... Normally, the disposition and sentence are also noted.... The chronology of the case in the docket book is extremely skeletal. It lists the dates and the generic legal titles of events (for example, declaration, indictment, answer, interrogatories) but provides no substance of these events.
 Michael S. Hindus et al., The Files of the Massachusetts Superior Court, 1859-1959 at 36 (1979) ("Files of the Massachusetts Superior Court"). A New York court described a similar usage. See Werfel v. Fitzgerald, 260 N.Y.2d 791, 791-93, 307 (App. Div. 1965) (per curiam) ("As used by the parties, the term `docket book' evidently refers to the record kept by the Clerk containing the entries of the proceedings.").