**UNITED STATES of America,**

v.

**Peter GOTTI, Anthony Ciccone, also known as "Sonny," Richard V. Gotti, Primo Cassarino, Jerome Brancato, also known as "Jerry," Richard G. Gotti, Peter Piacenti, also known as "Pete 17," Richard Bondi, Frank Scollo, also known as "Red" and "the**

---

little guy," Vincent Nasso, also known as "Dr. Nasso," Julius Nasso, also known as "Jules," Anthony Pansini, Salvatore Cannata, Anna Eylenkrig, Thomas Lisi, Carmine Malara and Jerome Orsino, Jr., Defendants.

No. 02–CR–606.

United States District Court,
E.D. New York.

June 22, 2004.

Bruce Cutler, Slotnick Shapiro & Crocker, Bruce Cutler, Law Offices of Bruce Cutler, Gerald L. Shargel, Joseph A. Bondy, The Law Offices of Joseph A. Bondy, George L. Santangelo, Santangelo & Cohen, Harry C. Batchelder, Jr., Laura A. Oppenheim, Rubinstein & Lorozzo, P.C., New York, NY, Domenick J. Porco, Scarsdale, NY, Richard Ware Levitt, Attorney

At Law, Thomas D. White, Joseph Tacopina, Law Offices of Joseph Tacopina, P.C., Joseph R. Corozzo, Jr., New York, NY, Richard D. Willstatter, Green & Willstatter, White Plains, N.Y. Jeremy F. Orden, Richard A. Medina, Gerald J. DiChiara, Gerald LaBush, Raymond Granger, Law Offices of Raymond R. Granger, Esq., New York, NY, Barry Levin, Garden City, NY, Alan S. Futerfas, Law Offices of Alan S. Futerfas Esq., Jack Litman, Richard E. Signorelli, Law Office of Richard E. Signorelli, Robert J. Hantman, Hantman & Associates, Russell Gioiella, Litman, Asche & Gioiella, LLP, New York, NY, Joseph Mure, Jr., Brooklyn, NY, Bruce McIntyre, McIntyre & Pope, New York, NY, Gary Farrell, Law Offices of Gary A. Farrell, Brooklyn, NY, Harold J. Pokel, Bennett M. Epstein, Attorney at Law, New York, NY, James DiPietro, Aronne & DiPietro, Brooklyn, NY, Ernest Hammer, New York, NY, for Defendants.

### *MEMORANDUM & ORDER*

BLOCK, District Judge.

Subsequent to the commencement of the sentencing proceeding of Peter Gotti on March 26, 2004, the Court received requests from members of the press to make public all sentencing letters the Court had received, which included letters from one Marjorie Alexander, whose name surfaced at the start of the proceeding when the Court identified her, as well as the defendant's wife, and his son, Peter Gotti, Jr., as having written such letters.[1] Because the press is entitled to a response from the Court and because the manner in which the Court views and processes letters to the Court addressing the sentence of a convicted criminal defendant, and counsels' responsibilities regarding such letters, are

matters of public concern, the Court has decided to address these important matters in a written opinion.

### FACTUAL OVERVIEW

### I. The Sentencing Proceeding

At the commencement of the sentencing proceeding on March 26th, which was a Friday, the Court announced that because of its complexity, the proceeding would not be completed that day. Before the Court turned to its sentencing calculations, the Court, as is its custom, identified the papers contained in its sentencing file. After the Court referenced the presentence report and addenda (the "PSR") prepared by the Probation Office and various submissions from counsel, and elicited assurances from defendant's counsel, Gerald Shargel, and from the principal Assistant United States Attorney ("AUSA") representing the government, that they had received the PSR and their opposing counsel's submissions, the following exchange occurred:

> THE COURT: Now I have the following additional submissions. I have a number of letters. For example, the top one is from Marjorie Alexander, I think. Also, I have Mrs. Gotti—I have a letter from Marjorie Alexander dated May 4th. The first one I reference[d] is dated August 4th. I have one from Marjorie Alexander dated March 22nd, 2003. I have a card here from Ms. Alexander. I have a letter from Margie Romano dated January 4, 2004. Ms. Alexander is very supportive of Mr. Gotti and has written many times to me. I have a letter from Peter Gotti, Jr. I have more letters from Marjorie Alexander; February 26, 2004. Is there anything else I should have?

---

1. The defendant had also written two letters to the Court, which it inadvertently failed to mention during the sentencing proceeding.

MR. SHARGEL: I don't think so, Judge.

[AUSA]: Judge, I don't think we have seen those letters. Perhaps at some point we could get copies of them. I don't think it is going to affect our ability to go forward.

THE COURT: It is up to you. That's why I go through the protocol. If you would like to take some time to look at them now, they are basically supportive letters. They really don't deal with sentencing issues.

[AUSA]: I don't think we need to take the time now. I think for our records to be complete we should have them at some point.

THE COURT: You can certainly look at them if you like.

[AUSA]: Thank you.

THE COURT: Now let's go to . . . making our sentencing calculations.

During a break in the proceeding late in the afternoon, the Court's courtroom deputy, Michael Innelli, advised the Court that a reporter from the New York Daily News had asked him whether the press could see the letters. The Court told Mr. Innelli to advise the reporter that they would not be released.

## II. The Release of the Letters by the AUSA to a New York Post Reporter

As recounted to the Court by Mr. Innelli, the AUSA called him on Monday morning, March 29th, at about 11:00 a.m., to obtain a copy of the letters. Mr. Innelli copied them and had them delivered at about 3:00 p.m. to the AUSA's office by interoffice mail. He also left a voice mail message at the AUSA's office at that time stating that the letters were not for public consumption and were only being furnished pursuant to the AUSA's request.

Mr. Innelli left work at about 4:30 p.m. that day, but at 6:00 p.m. he checked his voice mail; there was a message from a New York Post ("the Post") reporter asking whether the letters would be made available to the press. Mr. Innelli returned the reporter's call at about 10:00 a.m. the next morning, Tuesday, March 30th. The Post reporter asked whether the Court had sealed the letters; Mr. Innelli informed her that the Court had not, but that they were not public and remained in the Court's sentencing file. Mr. Innelli then informed the Court that he had sent a copy of the letters to the AUSA in response to his request, and that the press continued to inquire about the letters.

At about noon that day Mr. Innelli received a phone call from the AUSA. According to Mr. Innelli, the following transpired: The AUSA told him that the First Amendment entitled the press to the letters; Mr. Innelli disagreed and advised the AUSA that the Court's normal practice was that personal letters to the Court in respect to sentencing were not routinely docketed with the Clerk's Office and remained in the Court's sentencing file. Mr. Innelli told the AUSA that he would inform the Court of the AUSA's contention; the AUSA said he would do "whatever the judge said."

Mr. Innelli immediately related this conversation to the Court and, at the Court's direction, called the AUSA to tell him that the Court was taking the matter under advisement and that Mr. Innelli would inform the AUSA of the Court's decision as soon as it was rendered. The next day, Wednesday, March 31st, Mr. Innelli retrieved a voice mail message from the Post reporter inquiring about whether the Court had made its decision. Meanwhile, the Court had learned that there was no uniform practice by its colleagues as to

when, if at all, sentencing letters should be docketed and made public, and was in the throes of researching the issue.

### III. Ms. Alexander's Suicide and the Disclosure of Her Letters by the Post

On Wednesday night, the Court learned that Ms. Alexander had committed suicide. The next morning, Thursday, April 1st, the suicide was reported in the papers, and the Post printed excerpts from Ms. Alexander's letters, as well as an excerpt from Mrs. Gotti's letter. The excerpts from Ms. Alexander's letters spoke of her personal relationship with the defendant over fourteen years, railed against his being accused of being a crime boss, and spoke about her broken spirit and her need for anti-depressant medication. The excerpt from Mrs. Gotti's letter appeared under the caption: "Don's Venomous Wife Penned Poison Letter Asking Judge For Max." New York Post, April 2, 2004, p. 2.

That afternoon the Court called the U.S. Attorney's office to speak to the AUSA about whether he had any knowledge as to how the Post had obtained the letters, but reached Sam Noel, the AUSA's paralegal who had been at the sentencing proceeding. Mr. Noel candidly told the Court that he had been instructed by the AUSA in a phone call on Monday that he should copy the letters once he received them from the Court and give them to the Post reporter.

On Monday morning, April 5th, the AUSA spoke to Mr. Innelli by telephone and told him that he wished to apologize to the Court for his behavior. Thereafter, the Court conducted a hearing with the AUSA in chambers on May 26th, at which time the AUSA appeared with AUSA Daniel Alonso, representing the Eastern District of New York's United States Attorney's Office.[2]

### IV. The AUSA's Explanation

The AUSA acknowledged, as Mr. Innelli had reported, that he did indeed call Mr. Innelli at about 11:00 o'clock on Monday morning, March 29th, to request that a copy of the letters be sent to his office. The AUSA explained that he was not in his office at that time and that the letters should be sent to his paralegal, Mr. Noel. The AUSA did not tell Mr. Innelli that just before their conversation, the AUSA had received a call from the Post reporter. As he recounted: "she called and told me she wanted to do an article and if I had copies of those letters, could I make them available to her and I said I would." Hearing Transcript, May 26, 2004, at 12. His explanation for thereafter asking the Court for a copy of the letters was as follows:

I had wanted to get copies so that I could review them before the sentencing was completed and to have our file complete. So the two, I mean, her call prompted me to do what I intended to do anyway, which was to make sure I got a copy of the set. So that's when I called over to Mr. Innelli.

*Id.*

The AUSA offered that he was "always careful not to turn anything over [to the press] that wasn't in the public record," but that "in [his] mind" the letters were "part of the public record" and that he "didn't even imagine there was some special status to these letters." *Id.* at 16. The AUSA had personally never "encoun-

---

**2.** A transcript of this hearing, which was *in camera,* has been docketed as a public record simultaneously with the issuance of this decision. *See Phoenix Newspapers, Inc. v. United States Dist. Ct.,* 156 F.3d 940, 948 (9th Cir.1998)(determining that the First Amendment requires "release of transcripts [of closed proceedings] when the competing interests precipitating hearing closure are no longer viable") (quotation omitted).

tered the situation" where "letters were sent directly to the Court and that there was some different legal status perhaps to such letters." *Id.*

Nonetheless, right after the AUSA had asked Mr. Innelli to make a copy of the letters available to him, he had "reflected some more on it" and "decided it would be prudent to confirm in fact [that] the letters were ... filed with the Clerk of Court and part of the public record"; consequently, he called Mr. Innelli again, at around 12:30 or 1:00 p.m. that day, and "left a voice mail for Mr. Innelli saying [he] just wanted to confirm that these letters were docketed in the Clerk's Office." *Id.* at 20–21. However, the AUSA told the Court that before his second call to Mr. Innelli, the following had occurred: He had called Mr. Noel and told him that "we are getting copies of the sentencing letters," and that he should copy them and "give [them] to the Court Security Officer on the 19th floor so that a reporter from the Post can pick it up"; he then immediately called the Post reporter to tell her "that she would be able to pick up copies later in the day from Mr. Noel." *Id.* at 22.

The AUSA acknowledged that as soon as he had these second thoughts about authorizing the release of the letters to the Post reporter without first ascertaining if they had been docketed in the Clerk's office, he should have called Mr. Noel at once to tell him not to release the letters. As he explained:

> I viewed this as sort of my big mistake in this situation because I guess my thought process was that I would hear back from Mr. Innelli relatively quickly and that it would take some time before the letters were copied, routed, sent over to the U.S. Attorney's Office and that I had a little bit of comfort zone so if there was a problem, which I certainly didn't expect there would be, to tell Mr.

Noel not to turn the letters over. I realize now the far better thing to have done was to have called Mr. Noel immediately and say "don't turn them over until I hear back from the Court." And that course of action was something that just didn't occur to me at that time. *Id.* at 21–22.

The AUSA told the Court that he heard Mr. Innelli's voice mail message that the letters were not to be released at around 4:45 p.m. on Monday afternoon. *Id.* at 26. He immediately called the Court Security Officer, who told him that the Post reporter had picked up the letters about 10–15 minutes earlier. *Id.* at 28. The AUSA then called the reporter and asked her "to return the letters or destroy them because they were given to her by mistake" and that "the Court wanted them to be confidential." *Id.* at 29–30. After checking with her editors, the reporter called the AUSA back that same day and told him that "she agreed she would not write anything about this and she would return the letters and that she would keep it confidential." *Id.*

The AUSA acknowledged that he spoke to Mr. Innelli the next day, Tuesday, March 30th, and told him that he "would do whatever the judge wants." *Id.* at 35. The AUSA did not recall whether he told Mr. Innelli during that conversation "that the First Amendment entitled the press to have the letters." *Id.* at 36. His recollection was that he told Mr. Innelli "that it was my understanding of the law that there is an independent public interest in proceedings being open and that it was strange to [him] that there would be this category of letters that could be sort of neither in the public record nor formally placed under seal that the judge would have in his personal file in chambers." *Id.*

In response to the Court's comment that the AUSA knew at that time that he had

already turned the letters over to the Post reporter, the AUSA told the Court that he was "deeply sorry I didn't mention to Mr. Innelli I had turned the letters over." *Id.* at 37. The AUSA's rationale for not doing so was his belief "that there was no risk that these letters would get out" because he "had that promise [from the Post reporter] and [he] just believed that the problem was solved and there was no issue." *Id.* As he explained:

I couldn't imagine that [the Post reporter] would violate her promise knowing that the Court wanted them to be confidential, knowing that she—there were a couple of things. I mean, she is a reporter, has an ongoing relationship with the U.S. Attorney's Office because we do make courtesy copies of things available. And the bottom line is I put faith in her promise. I believed that she would not write those articles and disseminate those letters.

*Id.* at 37–38.

Mr. Alonso "shed some light on the background" bearing on the AUSA's "state of mind," as follows:

The press has a relationship with public offices that is basically as good as their word. And so when a reporter says "what you say is off the record or background," those are their buzz words, essentially the person talking to them is accepting their promise it's not going to be quoted in the newspaper the next day. If they break that promise, it violates that trust and no one will ever trust them again.

An assistant who received such a promise, again, acknowledging he should have told [Mr. Innelli], he apologizes, we apologize, but an assistant who received such a promise would have good reason to think that he had undone the damage, whatever damage had been done, because a reporter would never cut off

their nose to spite their face by breaking such a promise.

It's shocking that she did. But that's another issue between other parties.

*Id.* at 38.

The AUSA added: "[The Post reporter] would have had to have known if she were going to violate the promise that she would put me in the incredibly difficult position I'm in now and I did not believe she would do that." *Id.* at 38–39.

The AUSA told the Court that after learning on Wednesday that Ms. Alexander had committed suicide, the Post reporter told him that night that "the suicide of Ms. Alexander ha[d] created intense pressure in her newspaper to publish an article about these letters and that they were going to do it." *Id.* at 40.

In conclusion, the AUSA summed up his thought process as follows:

Your honor, from my point of view this whole thing has been very … traumatizing. I never intended to do anything to cause matters that shouldn't have been disclosed to be disclosed. I never intended to have a lack of candor to the Court. I view this from my point of view as the result of some mistakes and some misunderstandings about the status of these letters initially and perhaps putting some naive trust in the promise of the reporter.

*Id.* at 55.

## DISCUSSION

### I. The Conduct of the Assistant United States Attorney

Whatever may be the discourse as to whether sentencing letters should be made a matter of public record, the AUSA's conduct represented poor judgment and a lack of candor with the Court. As for his poor judgment, the AUSA ac-

knowledged that his "big mistake" was not aborting the delivery of the letters to the Post reporter once he had second thoughts about their confidentiality and thought it prudent to determine whether they had been docketed as public records with the Clerk's Office.

The AUSA had every reason to have these second thoughts. First, he knew that the letters were not submitted by defense counsel since Mr. Shargel stated at the sentencing proceeding that he had not seen them. Second, he knew that the Court had only referenced them in a general way and stated that they did not bear upon sentencing issues. Third, he knew that the Court had only offered the parties the opportunity to *read* them. In that regard, counsel for each party had the right to do so to assess whether anything in the Court's sentencing file might impact upon the Court's sentence, and the Court would have been remiss to deny either counsel this opportunity. *See United States v. Amodeo,* 71 F.3d 1044, 1048 (2d Cir. 1995) (*"Amodeo II"*) ("[t]he relevance or reliability of a statement or document generally cannot be determined until heard or read by counsel"). In short, common sense should have at once alerted the AUSA to the possibility that these types of letters might be of a confidential nature, which would have been self-evident if the AUSA had read the letters before releasing them to the Post; at the very least, the Court cannot fathom that any AUSA would not have first made certain that the letters had been docketed and, if so, had not been placed under seal, before providing copies to the press.

Perhaps the most troubling aspect of the AUSA's conduct was his lack of candor with the Court. Not only did he fail to tell the Court that the letters had been given to the Post until a week after their release, he misled the Court to believe that he would keep them confidential pending the Court's decision—telling the Court that he would do "whatever the judge wants"— knowing all the time that he had already given the letters to the press. *See Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1095 (11th Cir.1994) ("Every lawyer is an officer of the court . . . [and] he always has a duty of candor to the tribunal."); *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 457 (4th Cir.1993) ("[A] general duty of candor to the court exists in connection with an attorney's role as an officer of the court."). By keeping this information from the Court under the mistaken belief that the Post would never publicly disclose the letters, the AUSA precluded the Court from considering whether some prophylactic action could possibly have been taken to keep them from being publicly disclosed pending the Court's determination.

Although the Court does not believe that the AUSA acted maliciously and is satisfied that he is truly contrite and apologetic for his behavior, the Court must remind him that "government lawyers have responsibilities and obligations different from those facing members of the private bar. While the latter are appropriately concerned first and foremost with protecting their clients—even those engaged in wrongdoing—from criminal charges and public exposure, government lawyers have a higher, competing duty to act in the public interest." *In re Witness Before Special Grand Jury 2000–2,* 288 F.3d 289, 293 (7th Cir.2002). *See also United States v. Finazzo,* 704 F.2d 300, 309 (6th Cir. 1983) (as government representatives, Assistant United States Attorneys have a "higher duty cast upon them"). This includes " 'the duty to protect the interests of all people[.]' " *United States v. McClintock,* 748 F.2d 1278, 1285 (9th Cir.1984) (quoting *United States v. Butler,* 567 F.2d 885, 894 (9th Cir.1978) (Ely, J., concurring)).

By failing to ascertain whether the letters were sent in confidence to the Court, by failing to ascertain whether they had been made part of the public record, by failing to even read the letters before giving them to the Post, and by failing to be candid with the Court, the AUSA did not adhere to this higher duty.

■ The public interest compels the Court to comment on the AUSA's conduct as a reminder to all lawyers that they must always be candid in their dealings with the courts, and as an object lesson to government lawyers that they must ever be mindful of their higher duty, and should temper their desire to accommodate the press with an astute awareness of their obligation to "protect the interests of all people," which includes, in this case, Ms. Alexander and her family. *See Butler v. Biocore Medical Technologies, Inc.*, 348 F.3d 1163, 1169 (10th Cir.2003) ("the district court has ample discretion to comment, sternly when necessary, on a lawyer's performance in order to assure the proper conduct of proceedings in his or her court") (quotation omitted); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228

(1988) ("The Court may also chastise the prosecutor in a published opinion.").[3]

During the meeting with the AUSA, Mr. Alonso informed the Court that the United States Attorney for the Eastern District of New York was taking this matter "seriously," and "she is considering reviewing the press policy...." Hearing Transcript, May, 26, 2004, at 46–47. Presently, according to Mr. Alonso, although the written press policy "is not to turn anything over that's not part of the public record," "[t]here is no additional duty to go check although that may be implied." *Id.* at 48. The Court hopes that this will be made explicit, and that AUSAs will be properly trained to always check the public record to make certain that a document which they wish to make available to the press has been docketed, and not under seal, as a public document.

## II. Disclosure of Sentencing Letters

Turning to the issue of whether the Court should authorize the release of any of the letters in its sentencing file, it is useful to first explore the principles governing the public's right of access to judicial proceedings and documents in general, and to presentence and pretrial reports in particular.[4]

**3.** "[A] jurist's derogatory comments about a lawyer's conduct, without more, do not constitute a sanction." *In re Williams*, 156 F.3d 86, 92 (1st Cir.1998). Although the Court has refrained from sanctioning the AUSA, its comments about his conduct may arguably be viewed by others as a "linguistic" sanction subject to appellate review. *See generally Butler*, 348 F.3d at 1167–1169 (collecting cases addressing whether "linguistic" sanctions create a legally sufficient injury to support appellate review). *Compare Williams*, 156 F.3d at 92 ("critical comments made in the course of a trial court's wonted functions ... do not constitute a sanction and provide no independent basis for an appeal.") *with Sullivan v. Committee on Admissions and Grievances*, 395 F.2d 954 (D.C.Cir.1967) (holding that a finding of professional miscon-

duct not accompanied by other sanctions is analogous to a defendant found guilty but given a suspended sentence and is therefore appealable). Regardless of whether its decision could be construed as a "linguistic" sanction, the Court thought fairness dictated that the AUSA should be afforded notice and an opportunity to be heard.

**4.** A hearing was held by the Court on May 27th, 2004 to address the issue of whether the public has a right of access to the sentencing letters. In addition to the parties, the press was invited to participate. *See* May 20th, 2004 Order. David McCraw, Esq., Counsel to The New York Times, appeared for the press; Mr. Shargel for his client; Mr. Alonso for the government.

## A. The Common Law and Constitutional Overview

■ There is a common law right of access to judicial documents, *see Nixon v. Warner Communications,* 435 U.S. 589, 597–98, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), and a First Amendment right of access to both judicial proceedings and judicial documents. *See, e.g., Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)(First Amendment right to judicial proceedings); *In re New York Times,* 828 F.2d 110 (2d Cir.1987)(First Amendment right to judicial documents).

### 1. The Common Law Right of Access to Judicial Documents

The common law right of access to judicial documents under American jurisprudence traces its origin to the general English common law right of access to public records, but has a broader reach. For example, in *Ferry v. Williams,* 41 N.J.L. 332 (1879), the court noted that while in England the right to inspect public documents was frequently limited to situations where the person seeking inspection had a private interest in the document, in the United States the right was not so circumscribed; rather, it could be asserted by one seeking to represent the interests of the general public. *See also State ex rel. Colescott v. King,* 154 Ind. 621, 57 N.E. 535 (1900) (holding that the common law grants citizens the right of access to public records); *State ex rel Wellford v. Williams,* 110 Tenn. 549, 75 S.W. 948 (1903) (under the common law right of access, taxpayer has right to inspect the documents relating to the finances of the city in which he lives); *Nowack v. Fuller,* 243 Mich. 200, 203, 219 N.W. 749 (1928) ("If there be any rule of the English common law that denies the public the right of access to public records, it is repugnant to the spirit of our democratic institutions."). Notably, in *Nowack,* the court viewed the plaintiff, the publisher of a newspaper seeking to inspect public records pertaining to the expenditure of public funds, as having "a special interest." *Id.*

The first application found by the Court of the common law right of access to judicial records—as compared to public records in general—by an American court is *Ex parte Drawbaugh,* 2 App.D.C. 404 (1894), where the issue was whether the court should grant a motion to seal the file in a patent dispute. Noting that under the English common law, access to judicial records was subject to limitations (*e.g.,* a copy of a felony indictment could only be made public by court order), the court commented that "in the United States, no regulation of this kind is known to have been expressly made; and any limitation of the right to a copy of a judicial record or paper, when applied for by any person having an interest in it, would probably be deemed repugnant to the genius of American institutions." *Id.* at 406–07 (quotation omitted). Finding, therefore, that the sealing motion "would seem to be inconsistent with the common understanding of what belongs to a public court of record, to which all persons have the right of access, and to its records, according to long established usage and practice," the court denied the motion. *Id.* at 407–08. *See also In re Sackett,* 30 C.C.P.A. 1214, 136 F.2d 248 (1943) (rejecting motion to seal record and decision in patent case as violating public's right of inspection of court records, citing *Drawbaugh* ).

This common law right of access to judicial documents did not receive modern judicial analysis and application until the Supreme Court spoke in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). In deciding whether the Nixon White House

tapes, which were admitted into evidence in the trial of the President's former advisors, could be copied for broadcasting and sale to the public, the Court noted that the "contours" of this common law right "ha[d] not been delineated with any precision," *id.* at 597, 98 S.Ct. 1306, and that it was "difficult to distill from the relatively few judicial decisions a comprehensive definition ... or to identify all the factors to be weighed in determining whether access is appropriate." *Id.* at 598–99, 98 S.Ct. 1306. It cited with approval those cases granting access which concerned "the citizen's desire to keep a watchful eye on the workings of public agencies," and a newspaper publisher's intention "to publish information concerning the operation of government." *Id.* at 598, 98 S.Ct. 1306. It cautioned, however, that although there is a "presumption—however gauged—in favor of public access to judicial records," *id.* at 602, 98 S.Ct. 1306, this right of access "is not absolute" since "[e]very court has supervisory power over its own records and files." *Id.* at 598, 98 S.Ct. 1306. The Court also noted that access had been denied "where court files might have become a vehicle for improper purposes," such as "to gratify private spite or promote public scandal." *Id.* at 603, 98 S.Ct. 1306 (internal quotation omitted). Given the sparse caselaw and the imprecise contours of the common law right of access to judicial records, the Court counseled "that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* at 599, 98 S.Ct. 1306.

It was not until 1995, in *United States v. Amodeo,* 44 F.3d 141 (2d Cir.1995) ("*Amodeo I*"), in reviewing the propriety of a district court's decision to release a partially redacted version of a sealed investigative report filed with the court, that the Second Circuit examined the reach and application of the common law right of access to judicial records. As an initial matter, the circuit court held that for a document to be considered a "judicial document," and hence subject to this right of access, it must, in addition to being "physically filed" with the court, "be relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 145. While agreeing with the district court that the report was a judicial document to which the common law right of access applied, the Court of Appeals, citing *Nixon,* acknowledged that "the fact that a document is a judicial record does not mean that access to it cannot be restricted." *Id.* at 146 Accordingly, it remanded the case to the district court to consider the competing interests weighing against access in that case—the law enforcement privilege to protect confidential law enforcement information and the claim of privacy made by a law firm whose actions were discussed in the report—noting that the party seeking to restrict full public access to judicial documents has the burden to overcome the presumption in favor of access.

On remand, the district court made the redactions requested by law enforcement but rejected those proposed by the law firm. On further appeal, the Second Circuit, in *Amodeo II,* addressed "the standards to be used in balancing the presumption of access." 71 F.3d at 1047. It first recognized that the weight to be given the presumption is "based on the need for federal courts ... to have a measure of accountability and for the public to have confidence in the administration of justice," *id.* at 1048; accordingly, it "must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* at 1049. Thus, "[w]here testimony or documents play only a negligible role in the performance of Article III duties, the weight of the presumption is

low and amounts to little more than a prediction of public access absent a countervailing reason." *Id.* at 1050.

Significantly, the court in *Amodeo II* considered "[t]he privacy interests of innocent third parties," *id.* at 1050 (internal citation omitted) to be a paramount factor to be heavily balanced against the presumption of access once the weight of the presumption has been determined. Viewing such interests as "a venerable common law exception to the presumption of access," *id.* at 1051, it noted that "Courts have long declined to allow public access simply to cater to a morbid craving for that which is sensational and impure." *Id.* (internal citation omitted). It concluded:

> In determining the weight to be accorded an assertion of a right of privacy, courts should first consider the degree to which the subject matter is traditionally considered private rather than public. Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public.
>
> The nature and degree of injury must also be weighed. This will entail consideration not only of the sensitivity of the information and the subject but also of how the person seeking access intends to use the information. Commercial competitors seeking an advantage over rivals need not be indulged in the name of monitoring the courts, and personal vendettas similarly need not be aided.

*Id.*

## 2. The First Amendment Right of Access to Judicial Proceedings and Documents

### a. Judicial Proceedings

It was not until 1980, in the *Richmond Newspapers* case, that the Supreme Court addressed the issue of the First Amendment right of access to a judicial proceeding. As the Supreme Court shortly thereafter made clear in *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), its decision in *Richmond Newspapers* established that there is a qualified First Amendment right of access to criminal trials. *See id.* at 603, 100 S.Ct. 2814 ("Although there was no opinion of the Court in that case, seven Justices recognized that this right of access is embedded in the First Amendment, and applied to the States through the Fourteenth Amendment."); *see also id.* at 606, 100 S.Ct. 2814 ("Although the right of access to criminal trials is of constitutional stature, it is not absolute."). Both of these cases involved the propriety of courtroom closures during a criminal trial, and reversal was required in both because the court failed to make findings that closure was necessitated by a compelling governmental interest and was narrowly tailored to serve that interest. The Court explained in *Globe Newspaper* that "[t]wo features of the criminal justice system, emphasized in various opinions in *Richmond Newspapers,* together serve to explain why a right of access to *criminal trials* in particular is properly afforded protection by the First Amendment," *id.* at 604, 102 S.Ct. 2613: (1) "the criminal trial historically has been open to the press and general public," since "at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open," *id.*; (2) "the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole" because "in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential compo-

nent in our structure of self-government." *Id.* at 606, 102 S.Ct. 2613. The Court viewed these dual features to be recognized in both "logic and experience." *Id.*

The rationale of *Richmond Newspapers* and *Globe Newspaper* was extended to the *voir dire* of potential criminal trial jurors in *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*), and to a pre-trial suppression hearing in *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*). In *Press–Enterprise II,* the Court viewed the "experience and logic" considerations referenced in *Globe Newspaper* as a "test" to be passed before the qualified First Amendment right of public access attached, which would then create a "presumption" of access, to be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 9, 106 S.Ct. 2735 (quoting *Press Enterprise I*). In the context of the right of the accused to a fair trial, this meant that the presumption could only be surmounted by "specific findings ... demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Id.* at 14, 106 S.Ct. 2735. The Court explained that the "experience" part of the test required a court to determine "whether ... the place and process have historically been open to the press and the general public," and the "logic" aspect of the test required the court to ascertain whether "public access plays a significant positive role in the functioning of the particular process in question." *Id.*[5]

The Second Circuit has most recently applied the right of access under the First Amendment to criminal proceedings in rejecting the closure of juror *voir dire* in the celebrated Martha Stewart case. *See ABC, Inc. v. Stewart,* 360 F.3d 90 (2d Cir. 2004). The district court decided that in light of the intense publicity engendered by the case, it would be sufficient to provide the press with a copy of the transcript of the *voir dire* after the jury had been selected. The circuit court disagreed, finding that the "experience and logic" test articulated in *Globe* was satisfied, thereby creating the presumption of access, which was not overcome by the district court's findings because they did not differentiate the case "from any other high profile prosecution." *Id.* at 102. Specifically, under the standards promulgated by *Press–Enterprise II,* the findings did not establish "that there was a 'substantial probability' that the defendant's right to an impartial jury would be prejudiced by publicity that closure would prevent," *id.* at 100 (quoting *Press–Enterprise II*); nor did the district court adopt a "narrowly-tailored method of protecting the defendants' fair trial rights." *Id.* at 104.

**b. Judicial Documents**

*Richmond Newspapers, Globe Newspaper,* the *Press–Enterprise* cases and the *Stewart* case each involved the First Amendment right of access to criminal judicial proceedings, a right which the Second Circuit has recognized extends to civil proceedings as well. *See Westmoreland v.*

---

**5.** Curiously, although the Supreme Court recognized in *Globe Newspaper* that the historic openness of the courts in criminal trials had its genesis with the English system, the public's right of access to criminal trials, notwithstanding its historic root, seems to be only a matter of First Amendment jurisprudence under the "experience" prong, unlike the right of access to judicial documents, with its separate common law footing.

*Columbia Broad. Sys., Inc.*, 752 F.2d 16, 23 (2d Cir.1984). The Supreme Court has yet to consider the reach of the First Amendment to judicial documents; the Second Circuit has.[6] In *In re New York Times*, 828 F.2d 110 (2d Cir.1987), it held that "the First Amendment right of access applicable to a suppression hearing extends to the exhibits at the hearing." *Id.* at 114. In so holding, it noted that other circuits that have addressed the right of access to judicial documents under the First Amendment have construed it to apply to written documents submitted in connection with judicial proceedings that themselves implicate the right of access." *Id.* In remanding to the district court to reconsider its blanket sealing of the documents under the standards set forth in the *Press–Enterprise* cases—whether closure was necessary to preserve higher values and would be narrowly tailored to serve that interest—the court did not engage in the two-pronged "experience and logic" test, simply assuming that the First Amendment right of access was implicated.

In *United States v. Haller*, 837 F.2d 84 (2d Cir.1988), the circuit court held that the First Amendment right of access applied to plea agreements. As in *New York Times*, it made no mention, in applying the *Press–Enterprise* "higher value/narrow tailoring" standard, of the "experience and logic" test triggering the presumption of access. In *United States v. Suarez*, 880 F.2d 626 (2d Cir.1989), the court, in applying the First Amendment right of access to Criminal Justice Act forms, seemingly eschewed the "experience and logic" test in holding that "the presumption of openness applies to documents submitted in connection with a criminal proceeding," *id.* at 631, because it noted that there may not be a long tradition of accessibility to any such document. Agreeing that the public had a "strong interest in how its funds are being spent in the administration of criminal justice," *id.*, the court weighed this interest, in upholding access, against the defendants' claims that their right to the effective assistance of counsel, the attorney-client privilege, work-product protection and their right to privacy would all be violated by disclosure.

As the Court was putting the finishing touches to its decision, the Second Circuit rendered its decision in *Hartford Courant Co. v. Pellegrino*, 371 F.3d 49 (2d Cir. 2004), addressing the Court's misgivings that the circuit court had previously either ignored or rejected the application of the "experience and logic" test as the prerequisite to invoking the First Amendment presumption of access to judicial records. In applying the First Amendment right of access to docket sheets, the court explained that "[t]he circuits that have con-

**6.** In *Nixon,* the Supreme Court briefly considered whether the press had the right to the White House tapes under the First Amendment guarantee of freedom of the press. It noted that the press was not being denied access to the contents of the tapes since they "were given wide publicity by all elements of the media", 435 U.S. at 609, 98 S.Ct. 1306; rather, the issue was simply "whether these copies of the White House tapes—to which the public has never had *physical access*— must be made available for copying." *Id.* Answering this question in the negative, the Court held that "[t]he First Amendment generally grants the press no right to information about a trial superior to that of the general public"; hence, "a reporter's constitutional rights are no greater than those of any other member of the public." *Id.* Because *Nixon* only involved the narrow question of whether the tapes should be made available for copying, the case did not implicate the broader First Amendment right of public access to judicial documents. *See United States v. McVeigh*, 119 F.3d 806, 812 (10th Cir.1997) ("There is not yet any definitive Supreme Court ruling on whether there is a constitutional right of access to court documents and, if so, the scope of such a right.").

sidered the question have employed two types of reasoning in arriving at decisions that the public and press should receive First Amendment protection in their attempts to access certain judicial documents," *id.* at 58: (1) whether the document passed the "experience and logic" test "for establishing presumptive openness that the Supreme Court distilled from its precedents in *Press–Enterprise II*"; (2) whether the document was "derived from or [was] a necessary corollary of the capacity to attend the relevant proceedings." *Id.* at 59. In respect to the second approach, the court referenced its observation in *New York Times* that other circuits "have construed the constitutional right of access to apply to written documents submitted in connection with judicial proceedings that themselves implicate the right of access." *Id.*

The court held that under either approach the qualified First Amendment right of access attached to docket sheets. Under the "necessary corollary" approach, "the ability of the public and press to attend civil and criminal cases would be merely theoretical if the information provided in docket sheets were inaccessible," *id.* at 59, and under the "experience and logic" test, "[e]xperience casts an affirming eye on the openness of docket sheets and their historical counterparts," *id.*, and "[l]ogic supports this judgment of history." *Id.* at 61.

## B. Presentence and Pretrial Reports

Although the Second Circuit has addressed the issue of disclosure of presentence and pretrial reports to third parties, its decisions have not been predicated on either the common law or the First Amendment right of access.

In *United States v. Charmer Indus., Inc.*, 711 F.2d 1164 (2d Cir.1983), involving a request by the Arizona Attorney General

for the disclosure of a presentence report, the court explained that "[p]resentence reports are not public records but rather confidential reports to the trial judge for use in his effort to arrive at a fair sentence," and "[a]s other courts have held, requiring disclosure of a presentence report is contrary to the public interest as it may adversely affect the sentencing court's ability to obtain data on a confidential basis from the accused, and from sources independent of the accused, for use in the sentencing process." 711 F.2d at 1171 (internal quotation omitted). The court noted that "[a]lthough [Fed.R.Crim.P.] 32(c) sets the standards for release of presentence reports to defendants, their counsel, and the prosecuting attorneys, it is silent as to whether and under what circumstances such reports may be disclosed to 'third persons,' " meaning "entities other than the courts, the Parole Commission, the Bureau of Prisons, and probation officers." *Id.* at 1172.

Surveying judicial precedents, the court noted that "[i]n light of the evolution of Rule 32, and the prevailing judicial view that the public availability of presentence reports would likely inhibit the flow of information to the sentencing judge, some courts appear to have interpreted Rule 32(c) as imposing an outright prohibition on disclosure of the reports to third persons." *Id.* at 1173. The court chose, however, to adopt the view of most courts that have considered the issue—"that Rule 32(c) simply does not reach the question of disclosure to third persons"; accordingly, they "have sought to balance the desirability of confidentiality against the need of the moving party for disclosure of the document." *Id.*

Drawing from the restrictive standard established by the Supreme Court governing the release of grand jury materials, *see, e.g., Illinois v. Abbott & Assocs.*, 460

U.S. 557, 103 S.Ct. 1356, 75 L.Ed.2d 281 (1983), the court in *Charmer* concluded that given, *inter alia*, "the desirability of ensuring the free flow of information to the court," the district court "should not release a presentence report to a third person unless that person has shown a compelling need for disclosure to meet the ends of justice." 711 F.2d at 1176. The court counseled that the district court "has a fair measure of discretion in weighing the competing interests in order to determine whether or not the person seeking disclosure has shown that the ends of justice require disclosure." *Id.* at 1177.

The Second Circuit has applied its "compelling need for disclosure to meet the ends of justice" *Charmer* standard to guide district courts in handling a request by a defendant that the government disclose exculpatory or impeachment information in the presentence report of a government witness, *see United States v. Moore*, 949 F.2d 68 (2d Cir.1991), by a defendant seeking allegedly exculpatory information in a codefendant's presentence report, *see United States v. Molina*, 356 F.3d 269 (2d Cir.2004), and by a defendant seeking exculpatory or impeachment material in a government witness' pretrial services report, *see United States v. Pena*, 227 F.3d 23 (2d Cir.2000). In this latter regard, the court reasoned that pretrial services materials should be treated similarly to presentence reports "because both types of documents are created by court personnel for the purpose of assisting the court in making individualized and informed decisions concerning a defendant, and both are subject to similar statute-based confidentiality protection imposed in order to safeguard the full exchange of relevant information among a defendant, court-related personnel, and the judge." *Id.* at 27.

Unlike the Second Circuit, other courts addressing the disclosure of presentence reports to third parties have evaluated the issue under both the First Amendment and common law rights of access to judicial documents. A particularly comprehensive and insightful analysis of each of these rights is found in the Seventh Circuit's decision in *United States v. Corbitt*, 879 F.2d 224 (7th Cir.1989) ("*Corbitt II* "). With respect to the First Amendment, applying the two-pronged "experience and logic" test, the court considered "whether the document has historically been available to the public, and whether public access would promote the proper functioning of the government agency producing or considering the document," and concluded that there was no First Amendment right of access to presentence reports because they "have not generally been available to the public, and publicity would not help to insure that the presentence investigation is properly conducted." *Id.* at 237.

In respect to the common law right of access, the court's analysis was "somewhat different." *Id.* It recognized that since the presentence report is "undoubtedly in the district court's possession, the common law right of access attached to this document." *Id.* However, similar to the standard adopted by the Second Circuit in *Charmer*, it concluded that those seeking to invoke the common law right of access "must make a substantial and specific showing of need for disclosure before a district court may allow public inspection of the report." *Id.* at 238. It drew support for this conclusion from the Supreme Court's decision in *United States Department of Justice v. Julian*, 486 U.S. 1, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988), where the high court noted, in considering whether a presentence report was privileged from disclosure to the subject of the report under the Freedom of Information Act, that the reluctance to give third parties access to the report was caused by fear that disclosure would have "a chilling effect on the willing-

ness of various individuals to contribute information that will be incorporated into the report," as well as "the need to protect the confidentiality of the information contained in the report." *Corbitt II* at 238 (quoting from *Julian*). Notably, the Supreme Court referenced as an example of these dual concerns the Second Circuit's decision in *Charmer*. *See Julian*, 486 U.S. at 18, 108 S.Ct. 1606. Given the articulation of its standard under the common law right of access, the circuit court in *Corbitt II* remanded to the district court for application of the standard.[7]

## C. Sentencing Letters

At the May 27th hearing and in supporting papers, Mr. Shargel, who had read the letters just prior to the hearing, took the position as the defendant's attorney that the sentencing letters should be treated as permanently sealed. Relying on *Charmer*, he argued that there was no principled distinction between a presentence report and sentencing letters. Specifically, Mr. Shargel noted the highly personal nature of some of the letters, and argued that the free flow of such information to the Court would be effectively eliminated if those who wished to submit letters knew they did so at the risk of seeing their words on the front pages of the tabloids.

Mr. Alonso, who had also reviewed the letters, speaking for the government, merely took the position that release of sentencing letters was generally within the discretion of the Court; he declined to take a position as to whether release of the letters here at issue was warranted.

Mr. McCraw did not ask to read the letters; he argued on behalf of the press that sentencing letters sent directly to the courts warrant the presumption of disclosure under both the common law and First

Amendment. Relying primarily on the Second Circuit's decisions in *Amodeo I* and *II*, Mr. McCraw reasoned that the common law of right of access attached because the disclosure of sentencing letters allows the public to monitor the sentencing court's exercise of its Article III powers; furthermore, that "public disclosure helps assure that there is accountability not only in sentencing but in the letter-writers' representations to the court." Letter Brief of David McCraw, Esq., ("McCraw Letter") at 3. With regard to the First Amendment, Mr. McCraw argued that the presumption of access attaches because the "experience" prong is satisfied since "sentencing has traditionally been an open part of the criminal proceeding," and the "logic" prong is satisfied because "openness serves the important goals of assuring both the existence and appearance of fairness and accountability." McCraw Letter, at 4.

The Court's research has located only three cases addressing the issue of disclosure of sentencing letters sent directly to the court: two are from district courts within this circuit; the other is the district court's underlying decision in *Corbitt*.

In *United States v. Boesky*, 674 F.Supp. 1128 (S.D.N.Y.1987), the court noted that letters attached to the defendant's presentence memorandum were not in contention; however, there were letters received by the court from the defendant's immediate family "which [were] obviously of a confidential nature," as well as letters from third parties, "the text of which [were] such as to leave [the court] with the strong impression that the writers presumed that their letters would be confidentially treated, although the letters themselves [did] not say so." *Id.* at 1129. Without engaging in First Amendment or common law analysis, the court simply treated those

---

7. No subsequent decision from the district court has been found.

letters under the standard articulated in *Charmer* for the disclosure of presentence reports, namely that they would not be disclosed absent a "compelling need for disclosure to meet the ends of justice," *id.* at 1130 (quoting *Charmer*), concluding that "the case at hand [did] not meet that standard." *Id.*

In *United States v. Lawrence*, 167 F.Supp.2d 504 (N.D.N.Y.2001), the court referenced during sentencing a "significant number of letters it had received from a variety of individuals expressing their opinions about Defendant and the appropriate punishment." *Id.* at 505. A newspaper sought access to these letters, arguing that access was warranted under both the First Amendment and the common law. With respect to the First Amendment, the court began its analysis by noting that in *Charmer* "the Second Circuit has held, with no mention of the First Amendment, that presentence reports are not public documents and, therefore, courts have no obligation to disclose them." *Id.* at 507. The court reasoned that, although, unlike presentence reports, "the status of letters sent directly to the court is unclear," the "rationales for keeping presentence reports confidential are equally applicable," namely, that the "privacy expectations of citizens and the benefit of honest, uninhibited commentary on sentencing issues far outweigh the need for public access." *Id.* Therefore, the court agreed with *Boesky* that presentence letters sent directly to the court warranted "the same treatment as presentence reports." *Id.* It concluded that the First Amendment does not attach to the letters sent directly to the Court because "after balancing the interests of the parties, there is no need to violate the writers' legitimate expectation of confidentiality, when the media and the public were thor-

oughly informed at the sentencing hearing of the nature and quantity of the letters." *Id.* at 508.

Regarding the common law right of access, the court, citing to *Amodeo II,* held that "[i]n the present case, the specific contents of the letters sent directly to the Court did not play a significant role in the exercise of this Court's judicial power"; consequently, "the contents of those letters [were] of no value to the media and the public in their monitoring of th[e] Court's function." *Id.*

In *United States v. Corbitt*, 1988 WL 94278 (N.D.Ill.1988) ("*Corbitt I*") *vacated on other grounds by Corbitt II*, in addition to addressing the presentence report which thereafter was the subject of the Seventh Circuit opinion in *Corbitt II*, the district court also considered whether certain sentencing letters, which were not at issue in *Corbitt II,* should be disclosed. Noting that "[t]he Supreme Court has not answered the question of whether the first amendment grants the public access to *any* judicial documents," *id.* at *5, the court chose not to rely on the First Amendment, and pegged its decision on the application of the common law right of access balancing standard, concluding that the balance there tipped in favor of the disclosure of letters the court had received from public officials urging leniency in the sentencing of a local police chief since the public had "a right to know which representatives used their offices to encourage [the court] to treat [the defendant] leniently—especially since the outpouring of letters influenced [the court's] sentencing decision." *Id.* at *8. Even so, the court redacted certain personal and identifying facts about the authors of three of the letters "because they b[ore] an air of confidence." *Id.* at *9.[8]

---

8. The Seventh Circuit's subsequent opinion in *Corbitt II* did not discuss the disclosure of the

## D. Analysis

The Court concurs in the conclusions reached in *Boesky, Lawrence* and *Corbitt I,* but they do not appear to clearly articulate the analytic basis of their decisions, commingling the standard under *Charmer* with the standards separately applicable under the First Amendment and common law rights of access.

The absence of any analytical evaluation in *Charmer* under either the First Amendment or common law apparently stems from the court's holding that "presentence reports are not public records but rather confidential reports to the trial judge for use in his effort to arrive at a fair sentence." *Charmer,* 711 F.2d at 1171. If the same confidentiality attaches to sentencing letters sent directly to the trial judge, then, as in *Charmer,* a presumption of confidentiality would arise, which could be only overcome by a third party seeking disclosure by a "compelling need ... to meet the ends of justice." *Id.* at 1177.

If, on the other hand, sentencing letters be viewed as public records, and hence not entitled to a *Charmer* presumption of confidentiality, then the presumptive rights of access under both the common law and First Amendment would need to be assessed. Under the common law, as *Nixon* and the *Amodeo* cases teach, the presumption would automatically attach, but would have to be weighed based on the need for judicial accountability by the courts in the discharge of their Article III duties, and this weight would in turn have to be balanced principally against the privacy interests of third parties.

Under the First Amendment, as *Hartford Courant* views it, the presumption would attach to sentencing letters only if

they passed the "experience and logic" test, or were "derived from or [were] a necessary corollary of the capacity to attend the [sentencing hearing]." *Hartford Courant,* 371 F.3d at 59. Under conventional First Amendment analysis, if the presumption of access attached, it could be overcome only "by an overriding interest based on findings that [confidentiality] is essential to preserve higher values and [the court's decision] is narrowly tailored to serve that interest." *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. 2735 (citation omitted).

Thus, access under the common law is broader than the First Amendment in that the presumption under the common law attaches at once, while the presumption comes into play under the First Amendment only if the "experience and logic" test is passed or the document is a necessary corollary to attending the proceeding; however, once the presumption attaches under the First Amendment, its "compelling need/narrowly tailored" standard is stricter than the common law's more flexible balancing standard. *See In re Washington Post Co.,* 807 F.2d 383, 390 (4th Cir.1986) ("The common law does not afford as much substantive protection to the interests of the press and public as the First Amendment does."); *Rushford v. New Yorker Magazine,* 846 F.2d 249, 253 (4th Cir.1988) ("Under common law, there is a presumption of access accorded to judicial records," which can be rebutted "if countervailing interests heavily outweigh the public interest in access." Under the First Amendment, on the other hand, "the denial of access must be necessitated by a compelling government interest and nar-

---

letters, simply noting that the issue was not being challenged on appeal. *See Corbitt II,*

879 F.2d at 227 n. 1.

rowly tailored to serve that interest.")[9]

How then should presentence letters sent directly to the court by third parties be analyzed: under *Charmer*, the common law or the First Amendment?

■ It would seem that the same presumption of confidentiality that attaches to presentence reports, as well as to pretrial materials, should logically apply to sentencing letters since they share the common goal "of ensuring the free flow of information to the court," *Charmer*, 711 F.2d at 1176, and the chilling effect of presumptive disclosure might "adversely affect the sentencing court's ability to obtain data on a confidential basis from the accused, and from sources independent of the accused, for use in the sentencing process." *Id.* at 1171 (quotation omitted).

At the hearing on May 27th, counsel for The New York Times drew a distinction between presentence reports, as well as grand jury materials, on the one hand, and sentencing letters on the other hand, in that the former "are part of law enforcement and the executive branch functioning, not Article III functioning," arguing that there is a difference when "somebody in the executive branch administratively has made a judgment about whether to include them" than "the influence that is going directly to [the court] in exercising judiciary function." Hearing Transcript, May 27,

2004, at 26. The Court agrees: letters sent directly to the Court are designed to have a direct impact on the Court's sentence, rather than to be filtered by the Probation office for its consideration in the preparation of the presentence report; consequently, they take on the trappings of a judicial document under the common law since they are the functional equivalent of being "physically filed" with the court, and are directly "relevant to the performance of the judicial function." *Amodeo I*, 44 F.3d at 145.

Moreover, the confidentiality attendant upon presentence reports, as well as pretrial materials, have an underlying statutory base, similar to the statutory confidentiality surrounding grand jury proceedings, and are reflective of Congress' recognition that certain matters should be afforded presumptive confidentiality; sentencing letters, on the other hand, do not fall under the umbrella of any confidentiality statute.

The Court, therefore, does not believe that *Charmer* compels a conclusion that sentencing letters sent directly to the court require a presumption of confidentiality.

■ As for the First Amendment, the Court is of the opinion that no presumption of access attaches since there is no

---

**9.** Counsel for The New York Times, during oral argument on May 27th, in response to the Court's inquiry as to the conceptual differences between the First Amendment and common law rights of access, commented, at first, that he believed that "the common law test has been used more often in the Second Circuit for documents, the First Amendment test more often ... for proceedings." Hearing Transcript, May 27, 2004, at 24–25. He then postulated:

> I think the difference really is a matter of the degree to which your Honor's decision making is structured, that ultimately it is a balance as everyone up here has said. Un-

der the First Amendment test, after you get over the two-part hurdle you referred to, experience and logic, find the right attaches, then there is something that very much parallels the compelling interest test, the interest coming in has to be at a level that would suggest this constitutional right should be qualified or limited in some way. Historically the common law test has been used by the Courts to have, if you will, a more free forum balancing of those interests. But I think that if you look at it, ultimately you end up in the same place. *Id.* at 25.

historic basis for the disclosure of sentencing letters under the "experience" prong of the "experience and logic" test, and there is no "logic" in chilling the free flow of information by publicly disclosing letters sent in confidence to the court; nor are sentencing letters a necessary corollary to attending the sentencing proceeding since they have nothing to do with "the ability of the public and press to attend civil and criminal cases." *Hartford Courant*, 371 F.3d at 59.

These First Amendment hurdles do not impact the common law presumptive right of access to judicial records, and the common law provides a perfect standard for evaluating the disclosure of sentencing letters since it embraces both the public's right to be assured that the court is appropriately attending to its judicial responsibilities and the privacy interests of third parties. If the court gives little weight to the letters, the privacy rights of the writers should be accommodated; however, if the letters should have a significant impact on the court's sentence, the public is entitled to know this. Furthermore, disclosure, as Mr. McCraw aptly noted, would "help[ ] assure that there is accountability not only in sentencing but in the letter-writers' representations to the court." McCraw Letter, at 3. Under the ample flexibility afforded under the common law, the court will be able to appropriately accommodate and balance, in any given situation, the privacy interests of the letter writers and the public's entitlement to open sentencing proceedings.

## E. Application

■ In the present case, the Court gives little weight to the common law presumption of access to the sentencing letters as they did not influence the sentence. Moreover, Mrs. Gotti's letter and Ms. Alexander's letters are precisely the types of documents which the Supreme Court in *Nixon* warned would only "gratify private spite or promote public scandal," 435 U.S. at 598, 98 S.Ct. 1306, and would "simply cater to a morbid craving for that which is sensational and impure." *Amodeo II*, 71 F.3d at 1051. The letters reveal the nature of the writers' personal relationships with the defendant; Mrs. Gotti urged the Court to sentence her husband harshly; Ms. Alexander asked to Court to be lenient. Furthermore, Ms. Alexander presents herself as extremely emotionally labile; if she had learned that the letters had been released to the Post, she undoubtedly would have experienced great emotional pain and anguish. In sum, there is no reason in this case to publicly disclose the letters, and every reason to preserve the privacy interests of the writers.

Although the Court realizes that the Post has made excerpts from these letters public, making this determination somewhat academic, the Court will not compromise the integrity of the judicial process by approving their release and providing new opportunities for their public disclosure.

## F. Future Guidance

Consistent with its responsibilities under the common law right of access, the Court will henceforth treat sentencing letters sent directly to it from third parties in the following manner:

1. All such letters will be made available prior to the commencement of the sentencing proceeding for counsel to read.

2. At the commencement of the sentencing proceeding, the Court will publicly disclose the general nature of such letters; however, if the Court believes that the letters may significantly impact its sentence, the Court will make appropriate specific references to them during the sen-

tencing proceeding and will allow counsel to comment.

3. Letters received from public officials seeking to use their offices to impact a sentence will invariably be disclosed.

4. As a check and balance to ensure that the Court has made appropriate disclosures, the government lawyer shall, as part of his or her higher duty to act in the public's interest, advise the Court, *in camera,* at the end of the sentencing proceeding, if he or she believes that a sentencing letter or any part thereof, not previously publicly disclosed by the Court, should be disclosed. However, as if this decision does not make it perfectly clear, no letter or any part thereof shall be publicly disclosed by either the government lawyer or defense counsel in the absence of the Court's express authorization.

**SO ORDERED.**